**TAFT STETTINIUS & HOLLISTER LLP**
Jaimie L. Nawaday, #4294856
1155 Avenue of the Americas, Suite 2400
New York, NY 10036-2711
Telephone: (646) 914-1066
Facsimile: (646) 710-5247

*Counsel to Michael Wyse, as the Plan Administrator for the Voyager Wind-Down Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re*:<br>VOYAGER DIGITAL HOLDINGS, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10943 (MEW)<br><br>(Jointly Administered) |
| MICHAEL WYSE, as Plan Administrator for the Voyager Wind-Down Debtor,[1]<br><br>Plaintiff,<br>v.<br><br>GREAT MIDWEST INSURANCE CO.,<br><br>Defendant. | Adv. Pro. No. 26-__________ (___)<br><br>**ADVERSARY COMPLAINT** |

Michael Wyse, in his capacity as the Plan Administrator ("Plaintiff" or the "Plan Administrator") of Voyager Digital Holdings, Inc. *et al.* (collectively, the "Wind-Down Debtor" or "Voyager"), pursuant to the *Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166-1] (the

[1] The Wind-Down Debtor in these chapter 11 cases styled *In re Voyager Digital Holdings, Inc. et al.* pending in the United States Bankruptcy Court for the Southern District of New York at Case Number 22-10943 (MEW) (the "Chapter 11 Cases") consists of Voyager Digital Holdings, Inc. (7687), Voyager Digital Ltd. (7224), and Voyager Digital, LLC (8013). The Wind-Down Debtor's service address and principal place of business is 671 Headquarters Plaza, West Tower, Floor 6, Morristown, NJ 07960.

"Plan"), by and through his undersigned counsel, brings this Complaint against Defendant Great Midwest Insurance Co. ("GMIC"), and alleges as follows:

## NATURE OF THE CASE

1. Between February and November 2021, GMIC issued a total of 42 surety bonds (the "Surety Bonds" or "Bonds") to Voyager Digital, LLC (the "Principal") in connection with the Principal's money transmitter activities.[2] GMIC is an obligor on each of the Surety Bonds and is generally jointly and severally liable to the Principal's customers for any payment due and owing under the Surety Bonds. Generally speaking, the states in which the Operative Bonds were obtained (the "Surety Bond States") regulate businesses engaged in the business of money transmission, including those that receive money for transmission or engage in other statutorily defined money transmission activities, such as selling or issuing stored value or payment instruments (*i.e.*, engaging in money transmitter activities or applying to engage in such activities). These activities are generally governed by state money transmitter licensing laws, which, among other things, require applicants for and licensees of money transmitter licenses to obtain and maintain surety bonds to secure the faithful performance of their obligations and protect customers who suffer losses.

2. The Principal was required to faithfully conform to and abide by, *inter alia,* the express terms of the applicable bonds, including, without limitation, timely returning and refunding customer funds. In the event of the Principal's failure or inability to timely return and refund customer funds for any reason, GMIC, as co-obligor of the Surety Bonds, was and is

[2] GMIC issued a total of 42 bonds to the Principal; however, the claims in this Adversary Proceeding, except for Count II (addressing indemnification rights) concern only the 27 Surety Bonds identified in paragraph 54 (the "Operative Bonds"). Attached as **Exhibit A** are true and correct copies of the Surety Bonds.

obligated to the Principal's customers to step in and make them whole in the amount of the applicable Surety Bond.

3. At its peak, the Principal had over 3.5 million customers and assets totaling more than $5.6 billion. And, at the time of its bankruptcy, Voyager owed its U.S. customers over $1.7 billion. In the summer of 2022, the Principal and its affiliated debtor entities, including Voyager Digital Holdings, Inc. ("Holdings"), faced a liquidity crisis and could not meet customer demands. Ultimately, the Principal, Holdings and other Debtors (hereinafter defined) commenced Chapter 11 bankruptcy proceedings on July 5, 2022 (the "Petition Date").

4. Because the Principal failed to return funds to its customers, the Principal's conduct triggered GMIC's liability as co-obligor to the Principal's customers under the bonds.

5. Pursuant to the ballots that they returned in connection with their respective votes on the Plan, 31,867 creditors, all of whom were former customers of the Principal, elected to irrevocably contribute their respective claims against GMIC (and others) to the Wind-Down Debtor. Of those who assigned claims, 12,842 creditors are in the Surety Bond States (collectively, the "Assignors").

6. As of the Petition Date, the Assignors held over $363 million in crypto on the Voyager platform (the "Voyager Platform").[3] An anonymized list of the Assignors' contributed claims is attached as **Exhibit B**.[4]

7. On March 8, 2023, the United States Bankruptcy Court for the Southern District of New York confirmed the Plan. The Plan, which became effective on May 19, 2023 (the "Effective Date") provides, in relevant part, for the appointment of the Plan Administrator to, among other

---

[3] Terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[4] **Exhibit B** reflects each Assignor's state of residence at the time they registered to use the Voyager Platform. For example, a "New Jersey Assignor" refers to an Assignor with a residence in the state of New Jersey at the time they registered.

things, prosecute and/or settle claims held by the Debtors' (including the Principal's) creditors against, among others, GMIC.

8. On the Effective Date, the Assignors' Contributed Third-Party Claims were irrevocably contributed to the Wind-Down Debtor. *See* Plan, art. IV.R.

9. The Plan Administrator is responsible for prosecuting and/or settling the Assignors' contributed claims. *See id.* art. IV.H.5.(o) and J ("Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with [its] Money Transmitter Licenses.").

10. On November 30, 2023, the Plan Administrator submitted a timely claim to GMIC that concerned, in pertinent part, the claims on behalf of the Assignors under the Surety Bonds for the Assignors' losses caused by the Principal's failure to return funds owed to its customers (the "Bond Demand Claim").

11. On December 14, 2023, GMIC responded that it required additional information to evaluate the Bond Demand Claim.

12. In a series of letters dated May 7, 2024 and February 19, 2025, the Plan Administrator provided such information and renewed its demand that GMIC satisfy the Bond Demand Claim. As of the date of filing this Adversary Proceeding, GMIC has unlawfully refused to make any payment on the Surety Bonds to the Plan Administrator and has denied the Bond Demand Claim in breach of its obligations under each of the Surety Bonds.

13. In its Bond Demand Claim denial letters, GMIC asserted that its liability is not triggered because, among other things: (1) the Plan Administrator lacks standing to pursue the Bond Demand Claim on behalf of the Assignors; (2) the Assignors' injuries and losses are not

covered losses under the Surety Bonds; and (3) the Wind-Down Debtor is obligated to indemnify GMIC against any claims made against the Surety Bonds.

14. The Plan Administrator now brings this Adversary Proceeding against GMIC on behalf of the Assignors (1) for a declaration that the Plan Administrator has standing to make the Bond Demand Claim on behalf of the Assignors; (2) to disallow GMIC's claim seeking indemnity; and (3) to hold GMIC liable for breach of contract in connection with its refusal to satisfy the Bond Demand Claim.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § § 157 and 1334 because this is a civil proceeding related to a case under Title 11, *In re Voyager Digital Holdings*, No. 22-10943 (Bankr. S.D.N.Y.).

16. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157, and this Court has jurisdiction to hear and to determine this proceeding and to enter a final order and judgment. In the event that this Court or any other court finds any part of this Adversary Proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to the Chapter 11 Cases and will have a material impact on the administration of the Wind-Down Debtor's estate.

17. This Court also has jurisdiction under 28 U.S.C. § 1332(a), because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

18. This Court also has further jurisdiction under 28 U.S.C. § 2201 to issue declaratory judgment in cases of actual controversy.

19. Plaintiff consents to entry of final orders and judgments by this Court in this Adversary Proceeding pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

Plaintiff also consents to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

20. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

21. The statutory and legal predicates for the relief sought herein are 28 U.S.C. § 2201, Bankruptcy Code § 502, and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

22. This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Wind-Down Debtor's Chapter 11 estates. Fed. R. Bankr. P. 7001(a).

## PROCEDURAL HISTORY

23. On the Petition Date, each of the above-captioned debtors (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Court.

24. On March 10, 2023, the Court entered the *Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1166] (the "Confirmation Order") confirming the Plan.

25. The Confirmation Order provided for the appointment of the Plan Administrator upon the effective date of the Plan. On the Effective Date, the Debtors' assets were transferred and assigned to the Wind-Down Debtor, including any and all claims any of the Debtors may have against Defendant (by assignment or otherwise). Plan, art. IV.L. The Wind-Down Debtor is being administered by the Plan Administrator. *See id.* art. IV.H.1.

26. Pursuant to the Plan, the Plan Administrator has authority to administer, pursue, prosecute, litigate, settle, dismiss, or otherwise take action with respect to claims and causes of action against GMIC. *See id.* art. IV.H.5.(o) and J ("Nothing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with [its] Money Transmitter Licenses.").

**PARTIES**

27. The Wind-Down Debtor was established pursuant to the Plan.

28. The Wind-Down Debtor is being administered by the Plan Administrator. *See id.* art. IV.H.1.

29. Pursuant to the ballots that they returned in connection with their respective votes on the Plan, each of the Assignors, all of whom were former customers of the Principal, elected to irrevocably contribute their respective claims against GMIC to the Wind-Down Debtor.

30. The Plan Administrator is responsible for prosecuting and/or settling the Assignors' contributed claims. *See id.* art. IV.H.5.(o) and J.

31. GMIC's principal place of business is 800 Gessner Rd, Suite 600, Houston, TX 77024.[5]

32. Upon information and belief, GMIC provides a wide range of insurance products through nine underwriting divisions: "Accident & Health, Agriculture & Credit (re)Insurance, Captives, Construction & Energy Solutions, Global Property, Professional Lines, Specialty

---

[5] Great Midwest Insurance Company, 2026 Foreign Profit Corporation Annual Report (April 15, 2026), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=forp-f10000005101-44841b11-4f92-444c-8dea-cb5ba278c575&transactionId=f10000005101-db95ee73-0f4f-437d-a9a4-7bcd15dff832&formatType=PDF (last visited August 30, 2026).

Programs, Surety and Transactional E&S." GMIC is part of and is licensed to do business in 51 states and territories, including each of the Surety Bond States.

33. GMIC is an obligor on each of the Surety Bonds.

## FACTUAL ALLEGATIONS

### Voyager, Cryptocurrency, and Money Transmitter Laws

34. The Voyager Platform was founded in 2018 as a crypto brokerage platform for crypto investors.

35. The term "cryptocurrency" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "crypto assets," "digital assets," "virtual currencies," "coins," or "tokens."

36. Cryptocurrencies hold value based primarily on what a purchaser is willing to pay. They can be used to exchange or store value. There are thousands of cryptocurrencies in existence. Voyager users (*i.e.*, customers) accessed the Voyager Platform through the Voyager mobile application. The Voyager Platform allowed users to place orders to buy or sell crypto on the Voyager Platform.

37. The Voyager Platform was connected to the users' bank accounts and/or to their digital wallets, thereby allowing users to fund or withdraw fiat from their Voyager account, fund crypto purchases (using the fiat on deposit in their Voyager account), and to transfer crypto onto and off of the Voyager Platform.

38. Money transmitter licenses ("MTLs") are required in each of the Surety Bond States for entities that engage in money transmission. *See, e.g.*, Fla. Stat. § 560.204 ("Unless exempted, a person may not engage in, or in any manner advertise that they engage in, the activity of a payment instrument seller or money transmitter, for compensation, without first obtaining a

license under this part. For purposes of this subsection, the term "compensation" includes profit or loss on the exchange of currency, monetary value, or virtual currency."); Wash. Rev. Code § 19.230.030 ("A person may not engage in the business of money transmission, or advertise, solicit, or hold itself out as providing money transmission, unless the person is: (a) [l]icensed as a money transmitter under this chapter; (b) [a]n authorized delegate of a person licensed as a money transmitter under this chapter; or (c) [e]xcluded under RCW 19.230.020.").

39. In many states, including certain Surety Bond States, accepting and transferring crypto (not just fiat) requires an MTL or other equivalent exemption. *See, e.g.*, Me. Rev Stat Ann. tit. 32, § 6100-QQ ("A person may not engage in virtual currency business activity, or hold itself out as being able to engage in virtual currency business activity, with or on behalf of another person unless the person is [] A. [l]icensed in this State by the administrator pursuant to section 6091; or [] B. [e]xempt from licensing under section 6074."); Minn. Stat. § 53B.71 ("A person may not engage in virtual-currency business activity, or hold itself out as being able to engage in virtual-currency business activity, with or on behalf of another person unless the person is: (1) licensed in Minnesota by the commissioner under section 53B.40; or (2) exempt from licensing under section 53B.29.")

40. Voyager conducted money transmission by fulfilling customer orders for virtual currency by routing orders to liquidity providers and other exchanges.

41. Voyager's facilitation of the exchange of customers' fiat and crypto is quintessential money transmission.[6]

[6] *See, e.g.*, *In re Voyager Digital Ltd.*, No. 22-004-S, at 6 n.2 (Vt. Dep't of Fin. Regul. Sept. 13, 2022) ("Voyager's response on March 1, 2022, reported extensive unlicensed business activities with Vermont customers that appear to require a Vermont money transmitter license pursuant to 8 V.S.A., Chapter 79."); Press Release, Tex. Dep'tt of Banking, Banking Commissioner Issues Order Relating to Voyager Digital, LLC (Dec. 21, 2022) ("The Consent Order . . . was based on the Commissioner's finding that Voyager violated Texas Finance Code, Chapter 151, by providing money transmission services while it was neither licensed by the Department nor excluded from licensure

42. GMIC issued the Bonds specifically to secure money transmission activities and, upon information and belief, never contended during the applicable coverage periods (each, a "Coverage Period") that the Bonds were ineffective or that Voyager's business fell outside the scope of the contemplated purpose for which the Bonds were secured.

43. Even in states where crypto (unlike fiat) is not considered "money" or "monetary value," the transmission of fiat as part of a company's crypto transactions often brings a business within the purview of the money transmitter laws. *See, e.g.*, Conn. Gen. Stat. § 36a-603; La. Rev. Stat. § 6:1386.2; Minn. Stat. § 53B.73; N.D. Cent. Code § 13-09.1-48.

44. For the purposes of the Breach of Contract claims, at various points during the Coverage Periods, the Principal conducted money transmitter activities in Florida, Washington, Iowa, Maryland, Georgia, New Hampshire, South Dakota, Illinois, Alaska, Arizona, Oregon, Arkansas, Idaho, pending Connecticut, New York, New Mexico, North Carolina, North Dakota, Alabama, Nebraska, Maine, South Carolina, Rhode Island, Washington D.C., Minnesota, Louisiana, and Mississippi.

45. As required by applicable law and licensing standards, the Principal secured Surety Bonds in connection with its activities in these states.

46. Accordingly, the Principal conducted money transmitter activity and was therefore subject to the money transmitter laws of the Surety Bond States.

**Overview of the Surety Bonds**

47. In accordance with its efforts to obtain MTLs in certain states, the Principal began applying for and/or securing bonds from GMIC in or around February 2021. As part of that process, in each of the Surety Bond States, the Principal and GMIC entered into the Surety Bonds

---

requirements. Voyager has ceased unlicensed money transmission.").

for the benefit of the Principal's customers, including the Assignors who are obligees and third-party beneficiaries under each Bond.

48. Almost all of the Operative Bonds provide, in pertinent part, that GMIC agreed to be jointly and severally liable for any payment due and owing to the Principal's customers who suffered losses up to the limits of the Surety Bonds, prior to the cancellation date of any such bond.

49. The Principal has paid approximately $151,000 in premiums to GMIC for the Operative Bonds.

50. Each of the Operative Bonds identifies an effective date on which the bond became operative, and GMIC accepted premiums from the Principal for each such bond. GMIC did not rescind, void, or otherwise disclaim any of the Operative Bonds until after Voyager declared bankruptcy, nor did it return the premiums paid by the Principal in connection with those bonds.

51. Consistent with their terms, the Operative Bonds remained in effect until cancelled or otherwise terminated in accordance with their respective provisions. GMIC did not contend during the applicable Coverage Periods that any Operative Bond was void or ineffective. The majority of the Operative Bonds were Electronic Surety Bonds ("ESBs") maintained through the Nationwide Multistate Licensing System ("NMLS"), which serves as the system of record for ESBs associated with state licensing requirements. Through NMLS, surety companies create, execute, deliver, manage, maintain, and monitor ESBs throughout their lifecycle.

52. Upon information and belief, GMIC managed the Operative Bonds through NMLS and had continuous access to information regarding the existence, status, and administration of those bonds. NMLS also provides surety companies with the ability to manage bond records,

execute riders, generate reports regarding bond activity, and process bond actions, including cancelling ESBs.[7]

53. Notwithstanding its ability to manage, administer, and access a wealth of information about the ESBs through NMLS, GMIC did not cancel, void, rescind, or otherwise advise regulators or the Principal through NMLS or otherwise that any of the Operative Bonds were ineffective or unenforceable until after Voyager declared bankruptcy.

54. Each Bond Number, Amount, Assignors' Outstanding Claim Value, and Effective Date is set forth below:

| # | State | Bond Number | Bond Amount | State Assignors' Total Outstanding Claim Value | Bond Effective Date |
|---|---|---|---|---|---|
| 1. | Florida | GM206452 | $2,000,000 | $12,387,341 | February 11, 2021 |
| 2. | Connecticut | GM206455 | $1,000,000 | $2,219,755 | March 24, 2021 |
| 3. | New York | GM211837 | $500,000 | $696,716 | November 2, 2021 |
| 4. | Washington | GM211826 | $360,000 | $7,469,180 | October 16, 2021 |
| 5. | Iowa | GM209953 | $300,000 | $507,533 | March 30, 2021 |
| 6. | New Mexico | GM211834 | $300,000 | $305,279 | October 18, 2021 |
| 7. | North Carolina | GM209970 | $150,000 | $2,530,426 | June 15, 2021 |
| 8. | Maryland | GM209956 | $150,000 | $1,667,334 | March 30, 2021 |
| 9. | North Dakota | GM209960 | $150,000 | $125,607 | March 30, 2021 |
| 10. | Georgia | GM209969 | $100,000 | $2,902,785 | June 15, 2021 |
| 11. | Alabama | GM211828 | $100,000 | $496,185 | October 12, 2021 |
| 12. | Nebraska | GM209959 | $100,000 | $303,927 | March 30, 2021 |
| 13. | Maine | GM206454 | $100,000 | $113,848 | March 24, 2021 |
| 14. | New Hampshire | GM211831 | $100,000 | $568,512 | October 18, 2021 |
| 15. | South Dakota | GM209972 | $100,000 | $353,815 | June 15, 2021 |
| 16. | Illinois | GM211835 | $50,000 | $3,692,180 | October 21, 2021 |
| 17. | South Carolina | GM209962 | $50,000 | $942,360 | March 30, 2021 |

[7] NMLS, Bond Management for Surety Companies, https://mortgage.nationwidelicensingsystem.org/knowledge/Products/nmls/pubs/ugSuretyComp/surety/suretyCompany/maps/topics/suretyCompany_bondManagement.html (last visited August 30, 2026).

| # | State | Bond Number | Bond Amount | State Assignors' Total Outstanding Claim Value | Bond Effective Date |
|---|---|---|---|---|---|
| 18. | Rhode Island | GM209961 | $50,000 | $261,356 | March 30, 2021 |
| 19. | Washington D.C. | GM211830 | $50,000 | $371,159 | October 12, 2021 |
| 20. | Alaska | GM209973 | $40,000 | $280,777 | June 15, 2021 |
| 21. | Arizona | GM209975 | $25,000 | $2,737,465 | October 16, 2021 |
| 22. | Minnesota | GM211833 | $25,000 | $1,167,601 | October 18, 2021 |
| 23. | Louisiana | GM209955 | $25,000 | $948,811 | March 30, 2021 |
| 24. | Oregon | GM211827 | $25,000 | $929,171 | October 12, 2021 |
| 25. | Mississippi | GM209958 | $25,000 | $236,075 | March 30, 2021 |
| 26. | Arkansas | GM211829 | $10,000 | $441,675 | October 12, 2021 |
| 27. | Idaho | GM209951 | $10,000 | $540,949 | March 30, 2021 |

55. Surety bonds are widely viewed as a safeguard ensuring that customers are always able to access funds that they have entrusted to companies conducting money transmission. Indeed, it is commonly accepted that the surety bonds run "to the benefit of . . . any person or persons who suffer loss by reason of a licensee's or licensee's authorized delegate's violation of this chapter or the rules adopted under this chapter." Wash. Rev. Code. § 19.230.050(2).

56. The Surety Bonds generally provide for coverage and customer reimbursement under a variety of scenarios, including for those who were injured by the Principal's failure to comply with its re-payment obligations under the Bonds themselves or applicable regulations.

57. Upon information and belief, as of the date of the filing of this Adversary Proceeding Complaint, GMIC has not made a *single* payment to any claimant, including the Assignors, under any of the Surety Bonds, let alone those issued for the Operative Bonds. The aggregate claim amount for the Assignors in each Surety Bond State exceeds the available Bond Amount in all Surety Bond States except for North Dakota.

**The Principal Was Unable to Satisfy Customer Withdrawals and Declared Bankruptcy, Which Triggered GMIC's Liability**

58. Following a default by one of its largest borrowers – Three Arrows Capital ("3AC") – the Principal had insufficient assets to re-pay all of its customers and insufficient liquidity to withstand an ensuing "run on the bank." The Principal thereafter initially limited customer withdrawals, then suspended withdrawals as it sought strategic options. Shortly thereafter, on July 5, 2022, the Principal filed for Chapter 11 relief.

59. Each of the Operative Bonds specifies that the Surety is primarily liable in the event of the Principal's default, failure to faithfully perform a money transmitting obligation, or non-compliance with any bond condition. Some of the Surety Bonds explicitly require payment in the event of Voyager's "default." *See, e.g.*, Arizona Bond No. GM209975 (providing coverage to "any person injured by the wrongful act, ***default***, fraud or misrepresentation of the licensee or his employees.") (emphasis added); Florida Bond No. GM206452 (stating that "[t]he surety shall remain liable for all or any part of the obligations covered by this bond which may have accrued by ***default*** of the principal prior to the effective date of cancellation.") (emphasis added).

60. Several of the bonds and applicable state statutes also expressly provide that funds are payable in the event of the Principal's bankruptcy. *See, e.g.*, N.Y. Banking Law § 643(1) ("[I]n the event of the insolvency or bankruptcy of any licensee, the proceeds of the bond or bonds held for the exclusive benefit of the purchasers and holders of New York instruments and . . . shall be paid to the superintendent forthwith for disposition in accordance with the provisions of this article."); New York Bond No. GM211837 ("The proceeds of this bond shall constitute a trust fund for the exclusive benefit of the purchasers and holders of the licensee's New York Instruments. In the event of the insolvency or bankruptcy of the licensee, the proceeds of this bond shall be paid to the Superintendent of Financial Services forthwith for disposition in accordance

with the applicable provisions of the Banking Law."); Conn. Gen. Stat. § 36a-602(b) ("[P]roceeds of the bond . . . shall be deemed . . . to be held in trust for the benefit of any claimants . . . in the event of the bankruptcy of the licensee . . ."); Or. Rev. Stat. § 717.225(5) ("In the event of bankruptcy of the licensee, the security device shall be considered by operation of law to be held in trust for the benefit of purchasers and holders of the licensee's outstanding payment instruments.").

61. Many of the applicable statutes have words to the effect of "[e]very money transmitter licensee. . . shall transmit the monetary equivalent of all money or equivalent value received from a customer for transmission, net of any fees, or issue instructions committing the money or its monetary equivalent, to the person designated by the customer within ten business days after receiving the money or equivalent value." Wash. Rev. Code § 19.230.330(1)(a); *see also* Ariz. Rev. Stat. § 6-1224; Ark. Code Ann. § 23-55-610(a); Conn. Gen. Stat. § 36a-607(d); La. Rev. Stat. § 6:1056; Iowa Code § 533C.701; N.H. Rev. Stat. Ann. § 399-G:23.

62. Because Voyager has not fully cured its default to its customers, GMIC became and remains liable as a co-obligor under the Surety Bonds for those customers' losses up to the coverage amounts of the Operative Bonds (a total of $5,895,000).

**GMIC Breached its Obligations to the Assignors By Refusing to Satisfy the Plan Administrator's Bond Demand Claim**

63. As set forth above, Voyager was statutorily required to obtain surety bonds to protect its customers in the event of default. *See, e.g.,* Ga. Code Ann. § 7-1-683.2(b)(3) ("The bond shall be in a form satisfactory to the department and shall run to the State of Georgia ***for the benefit of*** the department or any payment instrument holders against the licensee or its agents. ***The condition of the bond shall require the licensee to pay any and all moneys for the benefit of any person damaged by noncompliance of a licensee or its agent with this article, with the rules***

***and regulations enacted pursuant to this article***, or with any condition of the bond ***or to pay any and all moneys that may become due and owing any creditor of or claimant against the licensee arising out of the licensee's money transmission in this state***, whether through its own acts or the acts of an agent.") (emphasis added); Fla. Stat. § 560.209 ("The corporate surety bond must be in a form satisfactory to the office and shall run to the state ***for the benefit of any claimants in this state*** against the applicant or its authorized vendors to secure the faithful performance of the obligations of the applicant and its vendors with respect to the ***receipt, handling, transmission, and payment of funds***.") (emphasis added).

64. Many of the state statutes requiring the Surety Bonds are explicitly to secure the Principal's faithful performance of its obligations with respect to "handling, transmission, and payment of funds." Fla. Stat. § 560.209; Idaho Code Ann. § 26-2908; 205 Ill. Comp. Stat. 658/10(a).

65. Voyager's failure to return funds entrusted to it by its customers triggers the express liability of each of the Bonds. Additionally, Voyager failed to abide by the timely transmission requirement under the relevant statutes. Because Voyager has not fully cured its default to its customers and violated other aspects of relevant money transmitter regulations, GMIC has become and remains liable as a co-obligor under the Surety Bonds for those customers' losses.

66. On November 30, 2023, the Plan Administrator wrote to GMIC to demand, in relevant part, payment on Surety Bonds it issued to the Principal. The Bond Demand Claim was on behalf of the Assignors who contributed their claims to the Wind-Down Debtor in accordance with the Plan, and was a timely claim for recovery under each of the Surety Bonds.

67. On December 14, 2023, GMIC responded by denying that the Surety Bonds cover the losses incurred by Voyager's customers and that, *inter alia*, the Plan Administrator lacked standing to assert any claim under the Bonds on behalf of the Assignors.

68. On May 7, 2024, the Plan Administrator renewed the Bond Demand Claim and responded to GMIC's meritless basis for denial.

69. On August 2, 2024, GMIC denied the Bond Demand Claim and reiterated the position taken in its December 14, 2023 letter.

70. On February 19, 2025, the Plan Administrator renewed its Bond Demand Claim once more and provided GMIC all detail necessary to satisfy the Bond Demand Claim. Nevertheless, GMIC failed to comply with the Bond Demand Claim in breach of the plain language of each of the Surety Bonds.

71. GMIC's continued unreasonable denial of the Assignors' claims, as brought by the Plan Administrator, constitutes a breach of the plain terms of the Surety Bonds.

**The Plan Permitted Creditors to Assign their Claims Against GMIC to the Plan Administrator**

72. The Plan provides, in relevant part, for the appointment of the Plan Administrator to, among other things, prosecute and/or settle claims held by Voyager's (including the Principal's) creditors against, among others, GMIC.

73. The Assignors' claims include the claims under the Surety Bonds because each Assignor contributed "all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the

marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform . . . ." Plan, art. I.A.51.

74. Pursuant to art. I.A.35 of the Plan, "'*Causes of Action*' mean any action, Claim, cross-claim, third-party claim, damage, judgment, cause of action, controversy, demand, right, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, lien, indemnity, interest, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law in accordance with applicable law. For the avoidance of doubt, 'Causes of Action' includes: (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Interests; (d) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code."

75. Additionally, the Plan specifies that "[n]othing in this Plan shall be construed to limit the rights of creditors, Debtors, the Wind-Down Debtor, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with this Money Transmitter Licenses." *Id.* art. IV.J.

76. Pursuant to the ballots that they returned in connection with their respective votes on the Plan, the Assignors, each of whom were former customers of the Principal, elected to irrevocably contribute their respective claims against, among others, GMIC to the Wind-Down Debtor.

77. Bankruptcy courts "follow[ ] principles of contract interpretation to interpret a confirmed plan of reorganization." *IQMax, Inc. v. Fusion PM Holdings, Inc.*, 2023 WL 2290815, at *1 (2d Cir. Mar. 1, 2023); *see In re AMR Corp.*, 562 B.R. 20, 28 (Bankr. S.D.N.Y. 2016) (finding that courts apply principles of contract law when interpreting a confirmed plan).

78. In this case, "the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control)." Plan, art. I.B (Governing Law).

79. The clear and stated intention of the Plan's provisions concerning the Contributed Third-Party Claims was and is to ensure that voting creditors understood they were assigning claims to the Plan Administrator and were not inadvertently releasing or waiving their pre-petition claims against the Debtors. Additionally, the Plan intended to "aggregate[e] all Contributed Third-Party Claims" against non-Debtor entities in order to "enable the pursuit and settlement of such litigation claims in a more efficient and effective manner" instead of, as would be the case here, each and every one of the Assignors having to make individual claims against GMIC on account of the Surety Bonds, which is both inefficient and could result in creditors competing for recoveries in multiple forums. *Id.* art. IV.Q; *see also In re AMR Corp.*, 562 B.R. at 29 ("Contracts are also

to be interpreted to avoid inconsistencies and to give meaning to all of its terms." (internal quotations and citations omitted)).

80. The Bond Demand Claim against GMIC (and this action to enforce the Surety Bonds) are clearly encompassed in "Causes of Action" that are "against any Person," that "had a direct relationship with the Debtors" and the Plan makes clear that it intended to preserve all claims of creditors and the Wind-Down Debtor against GMIC as a co-obligor under the Surety Bonds, and that such claims would be pursued in the aggregate by the Plan Administrator.

**The Plan Extinguished the Principal's Obligations Under the Surety Bond Program and GMIC's Proof of Claim Should be Disallowed**

81. On October 3, 2022, GMIC filed a proof of claim against Voyager Digital Ltd. GMIC based the claim on the Surety Bonds and a general indemnity agreement among the Debtor, Voyager Digital Ltd., Voyager Digital NY LLC, and GMIC (the "General Indemnity"). In an August 2, 2024 letter, GMIC asserted that the Wind-Down Debtor must indemnify GMIC against any claim made under the Bonds.

82. The Court should disallow GMIC's claim for three independent reasons. First, the Surety Bonds and the General Indemnity are not executory contracts, so the Wind-Down Debtor never assumed them. Second, the Plan has explicitly discharged the claim. Third, the claim is contingent, and section 502(e)(1)(B) of the Bankruptcy Code bars it.

**The Operative Bonds and Indemnity Agreement Are Not Executory Contracts, and the Wind-Down Debtor Did Not Assume Them**

83. The Operative Bonds and the General Indemnity are not executory contracts under section 365 of the Bankruptcy Code. *See In re Falcon V, L.L.C.*, 44 F.4th 348, 355 (5th Cir. 2022). The Wind-Down Debtor therefore could not have assumed them under the Plan. *See* Plan, art. V.E.

84. Even if the Operative Bonds and General Indemnity were executory contracts, the Plan still would not cover them. The Plan set out a specific process for assuming or rejecting executory contracts and unexpired leases, and the Findings and Conclusions state that the Debtors assumed executory contracts only as the Plan provided. The Plan assumed certain insurance policies, but not the Surety Bonds. The redline to the Third Amended Plan confirms this. It removes every reference to assuming the Surety Bonds and makes clear that the Debtors did not assume the indemnity agreements or the cash collateral obligation, and that the Bonds and the program would not continue after confirmation. *See* Docket No. 1117 at 135.

85. GMIC received notice of the Plan. It did not object to the Plan, and it did not contest its Findings and Conclusions or the Confirmation Order.

**The Plan's Discharge and Release Provisions Independently Extinguish GMIC's Claim**

86. The Plan's release provisions explicitly extinguished GMIC's claim. Art. VIII.B of the Plan provides that the Plan "release[s] and discharge[s] . . . all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and ***all Causes of Action***, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise." Plan, art. VIII.B, at 59–60 (emphasis added). As defined in art. I.A.35 of the Plan, "Causes of Action" expressly encompasses claims that are "indemnity . . . contingent or non-contingent . . . matured or unmatured . . . ." *Id.* art. I.A.35. Because the Plan's release provisions expressly reach contingent, unmatured causes of action, including indemnity claims, GMIC's indemnification claim falls squarely within the scope of the discharge. *See, e.g.*, *In re Manville Forest Prods. Corp.*, 209 F.3d 125, 127 (2d Cir. 2000) (finding that "indemnification rights owed to [the indemnitee] . . . were contingent claims discharged by the confirmation order"); *Bank of India v. Trendi Sportswear, Inc.*, No. 89 CIV. 5996 (JSM), 2002 WL 84631, at *4 (S.D.N.Y. Jan. 18, 2002),

*aff'd*, 64 F. App'x 827 (2d Cir. 2003) (surety's indemnification claim failed "as a matter of law" because debtor had been discharged).

**Section 502(e)(1)(B) Bars GMIC's Claim Because It Is Contingent**

87. Even if the Court rejects both arguments above, the Bankruptcy Code itself bars GMIC's claim. 11 U.S.C. § 502(e)(1)(B) ("Section 502(e)(1)(B)") requires the Court to "disallow any claim . . . to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim." 11 U.S.C. § 502(e)(1)(B). "A claim is contingent where it has not yet accrued and is dependent upon some future event that may never happen." *Highland Holdings & Zito I, L.P. v. Century/ML Cable Venture*, No. 06 CIV. 181, 2007 WL 2405689, at *5 (S.D.N.Y. Aug. 24, 2007), *aff'd sub nom. In re Century/ML Cable Venture*, 311 F. App'x 455 (2d Cir. 2009) (citation and internal quotation marks omitted). In *Highland Holdings*, the court disallowed the plaintiff's contingent claim because Highland sought indemnification for damages "it might have to pay" in an ongoing, unresolved litigation. *Id.* Here, GMIC seeks indemnification for losses it may have to pay under Surety Bonds, a liability that has not been fixed.

88. "The purpose of § 502(e)(1)(B) is to prevent contingent, unresolved indemnification or contribution claims from delaying the consummation of a plan of reorganization or a final distribution in a liquidating case." *In re GCO, LLC*, 324 B.R. 459, 466-67 (Bankr. S.D.N.Y. 2005). Because such claims "remain contingent," and further proceedings "would doubtless further delay a distribution [and] closing the Chapter 11 cases, they are precisely the type of claims that Congress determined should be disallowed under" § 502(e)(1)(B). *Id.*

89. This rule applies directly to sureties like GMIC. Section 502(e)(1)(B) "automatically disallows claims by codebtors seeking reimbursement, indemnity, or contribution

that are contingent at the time of the disallowance." *Aetna Cas. & Sur. Co. v. Ga. Tubing Co.*, No. 93 CIV. 3659 (LAP), 1995 WL 429018, at *2 n.2 (S.D.N.Y. July 20, 1995), *aff'd sub nom. Aetna Cas. & Sur. Co. v. Ga. Tubing Corp.*, 93 F.3d 56 (2d Cir. 1996). A surety's claim "is contingent . . . until the surety pays the principal creditor and fixes his own right to payment from the debtor," and Section 502(e)(1)(B) "disallows [the] contingent claim of the surety for reimbursement or contribution." *Id.* (quoting 3 *Collier on Bankruptcy* ¶ 502.05 at 502–88 (15th ed. 1995)). Because GMIC has not paid any obligee and has not fixed its right to payment, its claim remains contingent and must be disallowed.

90. GMIC's August 2, 2024 letter appears to be an improper attempt to force the Wind-Down Debtor to make a collateral contribution under the General Indemnity. The Court should disallow GMIC's proof of claim as to all Bonds. The Surety Bonds and the General Indemnity are not executory contracts, and the Wind-Down Debtor never assumed the obligations GMIC now seeks to enforce. The Plan's discharge and release provisions independently extinguish the claim, and because the claim is contingent, it is barred by Section 502(e)(1)(B).

**COUNT I**

**<u>Declaratory Judgment – Interpretation of Contributed Third-Party Claim</u>**

91. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

92. GMIC has denied the Plan Administrator's Bond Demand Claim on the basis that the Plan Administrator lacks standing to make a claim under the Surety Bonds.

93. As set forth in the Plan, the Assignors contributed and assigned their claims under the Surety Bonds to the Plan Administrator when they submitted their ballots in connection with the Plan confirmation process.

94. The Assignors' claims include the Bond Demand Claim because each Assignor contributed all Contributed Third-Party Claims as set forth in the Plan.

95. Contributed Third-Party Claims are defined in the Plan as "all direct Causes of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Voyager, including (a) all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Voyager's platform . . .."

96. Plaintiff seeks a declaratory judgment that the Contributed Third-Party Claims include the Assignors' claims against the Surety Bonds.

97. A declaratory judgment is necessary to give effect to the Plan and promote the efficient administration of the Plan.

**COUNT II**

**Disallowance of Claim Pursuant to 11 U.S.C. § 502**

98. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

99. GMIC asserted a pre-petition claim in an undetermined amount allegedly arising from the General Indemnity as attached to Claim No. 11193 filed on October 3, 2022.

100. Claim No. 11193 purports to seek indemnification for losses, liabilities, or expenses, including attorneys' fees, incurred by GMIC in connection with any claim made by an obligee under all 42 surety bonds issued by GMIC to Voyager.

101. Section 502(e)(1)(B) is applicable to the General Indemnity because it relates to a debt owed by the debtor to a creditor (*i.e.*, the Assignors) which has been guaranteed by a third

party (*i.e.*, GMIC). The General Indemnity is (1) a contingent claim; (2) a claim for reimbursement or contribution; and (3) GMIC is co-liable with the Debtors with respect to the claim.

102. Here the obligees (creditor Assignors) under all Surety Bonds have made claims against the Debtors, and if those same claims are made against GMIC as co-obligor, GMIC could in turn (and has indicated it will) make a claim against the Debtors for indemnification. Accordingly, the Wind-Down Debtor may be subject to two demands for payment on the same debt.

103. In addition to the 27 Surety Bonds in the Surety Bond States, there are 15 additional surety bonds outstanding under which other entities, namely state money transmitter regulatory authorities, could pursue recovery from GMIC on account of covered losses. GMIC would then assert a claim against the Principal pursuant to the General Indemnity.

104. Although the Plan Administrator is not aware that any such claim by a regulator against GMIC has been brought, the statute of limitations for such claims varies and can last six years from when such claim accrued. To bring finality and promote the efficient administration of the Wind-Down Debtor and timely payment to creditors, the Plan Administrator seeks a determination that the General Indemnity should be disallowed pursuant to Section 502(e) of the Bankruptcy Code.

105. Claim No. 11193 must be disallowed under 11 U.S.C. § 502(e).

**FLORIDA – BOND NO. GM206452**

**COUNT III**
**<u>Breach of Contract</u>**
[on behalf of Florida Assignors]

106. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

107. Voyager and GMIC are parties to the Florida Bond (hereinafter defined), which became effective on or about February 11, 2021. Voyager and GMIC subsequently executed a Rider to the Florida Bond, effective as of February 1, 2022 (collectively, the "Florida Bond").

108. The Florida Bond is a valid, enforceable, and binding contract, pursuant to which GMIC agreed to be bound in the principal amount of $2,000,000. *See* Florida Bond No. GM206452.

109. The Florida Bond provides that Voyager "is acting as a Part II Licensee pursuant to Chapter 560 Florida Statutes [the "Florida Statutes"]." *See* Florida Bond No. GM206452. On or about June 27, 2019, Voyager obtained a Money Services Businesses Part II License.

110. In connection with obtaining the Florida Bond, Voyager paid a premium to GMIC in the amount of $50,000.

111. As part of the Florida Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

112. Under the clear and unambiguous terms of the Florida Statutes, the Bond is "to secure the **faithful performance of the obligations of the applicant and its vendors with respect to the receipt, handling, transmission, and payment of funds.**" Fla. Stat. § 560.209(3)(b) (emphasis added). As part of the Florida Bond, "any claimant may bring an action in a proper court on this bond resulting from the failure of the principal . . . to faithfully perform obligations with respect to the receipt, handling, transmission, and payment of funds." Florida Bond No. GM206452. The Florida Bond also provides that the Bond be "conditioned on conformance with Chapter 560, Florida Statutes." *Id.*

113. Therefore, under the terms of the Florida Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Florida laws on money transmission, and other applicable rules.

114. Voyager has breached the clear terms of the Florida Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Florida Bond.

115. In connection with Florida Bond No. GM206452, GMIC is obliged to pay the Florida Assignors for damages suffered.

116. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Florida Assignors against GMIC. As of the date of this Complaint, there are 3,004 Florida customers that assigned their claims to Plaintiff. The outstanding amount of the Florida Assignors' claims exceeds the value of the Florida Bond. The Florida Assignors will not be made whole in the Chapter 11 Cases.

117. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Florida Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Florida Bond and has thereby materially breached its obligations under the Florida Bond.

118. As a direct and proximate result of GMIC's breach of the Florida Bond, the Florida Assignors have been damaged in an amount to be determined at trial, but no less than $2,000,000.

## CONNECTICUT — BOND NO. GM206455

**COUNT IV**
**<u>Breach of Contract</u>**
[on behalf of Connecticut Assignors]

119. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

120. Voyager and GMIC are parties to the Connecticut Bond (hereinafter defined), which became effective on or about March 24, 2021 (the "<u>Connecticut Bond</u>").

121. The Connecticut Bond is a valid, enforceable, and binding contract, pursuant to which GMIC agreed to be bound in the principal amount of $1,000,000. *See* Connecticut Bond No. GM206455.

122. Voyager obtained the Connecticut Bond, as required by Conn. Gen. Stat. § 36a-602, in connection with its money transmission business in Connecticut.

123. In connection with obtaining the Connecticut Bond, Voyager paid a premium to GMIC in the amount of $25,000.

124. As part of the Connecticut Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

125. Under the clear and unambiguous terms of the Connecticut Bond, GMIC specifically agreed to be "held and firmly bound . . . for the use of the people of Connecticut and the Commissioner, as Obligees, in the penal sum of $1,000,000. . . . If the said Principal . . . shall faithfully perform all obligations of the Principal with respect to the Principal's money transmission business in Connecticut and conduct such business in Connecticut consistent with the provisions of Sections 36a-595 to 36a-612, inclusive, of the Connecticut [] Statutes, as may be

amended, and any regulations adopted thereunder, then this obligation shall be null and void; otherwise to remain in full force and effect." Connecticut Bond No. GM206455.

126. The Connecticut Bond also provides that "[a]ny person who may be damaged as a result of the failure by the Principal . . . to perform obligations with respect to the Principal's money transmission business in Connecticut may proceed against this bond to recover damages, as permitted by law, including, but not limited to, Section 38a-290 of the Connecticut General Statutes, as may be amended." Connecticut Bond No. GM206455.

127. Therefore, under the terms of the Connecticut Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Connecticut laws on money transmission, and other applicable rules.

128. Pursuant to the Connecticut Statutes, the Connecticut Bond proceeds must be held in trust for claimants like the Connecticut Assignors. The Connecticut Statutes state that the "**proceeds of the bond,** even if commingled with other assets of the licensee, **shall be deemed by operation of law to be held in trust for the benefit of any claimants against the licensee to serve the faithful performance of the obligations of the licensee . . . with respect to the licensee's money transmission business in this state in the event of the bankruptcy of the licensee, and shall be immune from attachment by creditors or judgment creditors. Any person who may be damaged as a result of the failure by the licensee or the licensee's authorized delegates to perform obligations with respect to the licensee's money transmission business in this state** may proceed against the licensee's bond to recover damages." Conn. Gen. Stat. § 36a-602(b) (emphasis added).

129. The Connecticut Statutes provide that "[e]ach licensee shall remit any money or monetary value received for transmission by the licensee . . . to the person designated by the

purchaser of such transmission not later than seven calendar days from the date of receipt of such money or monetary value from the purchaser unless otherwise directed by the purchaser." Conn. Gen. Stat. § 36a-607(d).

130. The Connecticut Statutes also provide that "[a] **licensee that engages in the business of money transmission** in this state by receiving, transmitting, storing or maintaining custody or control of virtual currency **shall not: (1) [s]ell, transfer, assign, lend, hypothecate, pledge or otherwise use or encumber virtual currency stored, held, controlled, maintained by, or under the custody or control of, such licensee on behalf of a person**, except for the sale, transfer of ownership or assignment of such virtual currency at the direction of such person." Conn. Gen. Stat. § 36a–613(f)(1) (emphasis added).

131. Voyager has breached the clear terms of the Connecticut Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Connecticut Bond.

132. In connection with Connecticut Bond No. GM206455, GMIC is obliged to pay the Connecticut Assignors for damages suffered.

133. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Connecticut Assignors against GMIC. As of the date of this Complaint, there are 462 Connecticut customers that assigned their claims to Plaintiff. The outstanding amount of Connecticut Assignors' claims exceeds the value of the Connecticut Bond. The Connecticut Assignors will not be made whole in the Chapter 11 Cases.

134. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Connecticut Bond. Plaintiff has renewed those demands in May 2024 and February

2025. GMIC has refused to make any payments to customers under the Connecticut Bond and has thereby breached its obligation under this contract.

135. As a direct and proximate result of GMIC's breach of the Connecticut Bond, the Connecticut Assignors have suffered damages in an amount to be determined at trial, but no less than $1,000,000.

**NEW YORK — BOND NO. GM211837**

**COUNT V**
**Breach of Contract**
[on behalf of New York Assignors]

136. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

137. Voyager and GMIC are parties to the New York Bond, which became effective on November 2, 2021 ("New York Bond").[8]

138. The New York Bond is a valid, enforceable, and binding contract pursuant to which GMIC specifically agreed to be bound in the principal amount of $500,000. *See* New York Bond No. GM211837.

139. Voyager Digital NY LLC obtained the New York Bond, as required by N.Y. Banking Law § 643, in connection with its money transmission business in New York.

140. In connection with obtaining the New York Bond, Voyager paid a premium to GMIC in the amount of $12,500.

141. As part of the New York Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

[8] Although Voyager Digital NY LLC is named in the New York Bond, this entity was not operational, and the New York Assignors were customers of Voyager. Because the New York Bond is for the benefit of New York Assignors, it is, in effect, between GMIC and Voyager.

142. Under the clear and unambiguous terms of the New York Bond, GMIC specifically agreed to be "firmly bound unto the benefit . . . of any person or persons who may have a cause of action against the Principal for failure to carry out the terms of any New York instrument which the Principal shall have issued or sold under and by virtue of the provisions of art. 13-B of the Banking Law of the State of New York, in the principal sum of **$500,000**." New York Bond No. GM211837. The New York Bond also states that "upon receiving a license to transmit money . . . the Principal promises to comply with and abide by the provisions of [Banking Law Section 641] and the rules and regulations of the Department and **will honestly and faithfully perform all obligations and undertakings in connection with the issuance, sale and payment of any New York Instruments issued or sold by the Principal pursuant to the aforesaid statute and will pay to . . . any person(s) all money that becomes due and owing to . . . such person(s) under the aforesaid statute**, because of any New York Instrument issued or sold by the Principal as licensee under and by virtue of the provisions of the aforesaid statute, **provided that nothing in this paragraph shall affect the obligations of the surety as set forth hereinafter**." *Id.* (emphasis added).

143. Therefore, under the terms of the New York Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with New York banking laws, and other applicable rules.

144. Voyager has breached the clear terms of the New York Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the New York Bond.

145. In connection with New York Bond No. GM211837, GMIC is obliged to pay the New York Assignors for damages suffered.

146. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the New York Assignors against GMIC. As of the date of this Complaint, there are 134 New York customers that assigned their claims to Plaintiff. The outstanding amount of the New York Assignors' claims exceeds the value of the New York Bond. The New York Assignors will not be made whole in the Chapter 11 Cases.

147. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the New York Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the New York Bond and has thereby breached its obligation under this contract.

148. As a direct and proximate result of GMIC's breach of the New York Bond, the New York Assignors have been damaged in an amount to be determined at trial, but no less than $500,000.

**WASHINGTON – BOND NO. GM211826**

**COUNT VI**
**Breach of Contract**
[on behalf of Washington Assignors]

149. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

150. Voyager and GMIC are parties to the Washington Bond, which became effective on October 16, 2021 (the "Washington Bond").

151. The Washington Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $360,000. *See* Washington Bond No. GM211826.

152. The Washington Bond provides that Voyager "has applied for a license to transact business as provided by law under Chapter 19.230 Revised Code of Washington, known as the 'UNIFORM MONEY SERVICES ACT' of the State of Washington (ACT) [the "Washington ACT"], acts amendatory thereto, and rules adopted thereunder." Washington Bond No. GM211826. Voyager applied for and obtained such a license on or around March 15, 2019.

153. In connection with obtaining the Washington Bond, Voyager paid a premium to GMIC in the amount of $9,000.

154. As part of the Washington Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

155. Under the clear and unambiguous terms of the Washington Bond, GMIC agreed that if Voyager "and its owners, officers, employees, authorized delegates, independent contractors, affiliates, and subsidiaries shall, upon the issuance of said license as aforesaid, faithfully conform to and abide by each and every provision of said ACT and all rules and regulations lawfully made by the Director of the Department of Financial Institutions of the State of Washington thereunder, and if [Voyager] will pay to the state and to any person or persons all amounts due and owing under and by virtue of the provisions of said ACT, then this obligation to be void; otherwise the obligation of [GMIC] to pay said amounts due and owing by the obligor under and by virtue of the provisions of said [Washington] ACT shall remain in full force and effect."

156. Therefore, under the terms of the Washington Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Washington laws on money transmission, and other applicable rules.

157. Pursuant to the Washington ACT, "the surety bond shall run to the state of Washington as obligee, and [it] shall run to the benefit of the state and **any person or persons who suffer loss by reason of a licensee's or licensee's authorized delegate's violation of this chapter or the rules adopted under this chapter.**" Wash. Rev. Code § 19.230.050(2) (emphasis added). Additionally, the Washington ACT provides that "**[e]very money transmitter licensee and its authorized delegates shall transmit the monetary equivalent of all money or equivalent value received from a customer for transmission, net of any fees, or issue instructions committing the money or its monetary equivalent, to the person designated by the customer within ten business days after receiving the money or equivalent value**, unless otherwise ordered by the customer or when the transmission is for the payment of goods or services or unless the licensee or its authorized delegate has reason to believe that a crime has occurred, is occurring, or may occur as a result of transmitting the money." Wash. Rev. Code § 19.230.330(1)(a) (emphasis added).

158. The Washington ACT also provides that "[a] claimant against a money transmitter licensee may maintain an action on the bond." Wash. Rev. Code § 19.230.050(2).

159. Voyager has breached the clear terms of the Washington Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Washington Bond.

160. In connection with Washington Bond No. GM211826, GMIC is obliged to pay the Washington Assignors for damages suffered.

161. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Washington Assignors against GMIC. As of the date of this Complaint, there are 1,259 Washington customers that assigned their claims to Plaintiff. The

outstanding amount of the Washington Assignors' claims exceeds the value of the Washington Bond. The Washington Assignors will not be made whole in the Chapter 11 Cases.

162. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Washington Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Washington Bond and has thereby breached its obligation under this contract.

163. As a direct and proximate result of GMIC's breach of the Washington Bond, the Washington Assignors have suffered damages in an amount to be determined at trial, but no less than $360,000.

**IOWA – BOND NO. GM209953**

**COUNT VII**
**Breach of Contract**
[on behalf of Iowa Assignors]

164. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

165. Voyager and GMIC are parties to the Iowa Bond, which became effective on March 30, 2021. A rider to the Iowa Bond increasing the bond amount to $300,000 was effective on November 29, 2021 (collectively, the "Iowa Bond").

166. The Iowa Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $300,000. *See* Iowa Bond No. GM209953.

167. The terms and conditions of the Iowa Bond are as follows:

a. The Iowa Bond provides that Voyager "is licensed or has applied to the Superintendent of Banking for a license to engage in the business of money

transmission pursuant to Iowa Code Chapter 533C." Iowa Bond No. GM209953. Voyager obtained such a license on or around December 9, 2021.

b. The Iowa Bond also says "[i]f [Voyager] faithfully conforms to and abides by the provisions of Iowa Code Chapter 533C and all rules and regulations promulgated thereunder, and shall satisfy any loss or damages suffered by the State of Iowa, purchasers or holders of instruments sold by the licensee, or any person(s) who may have a cause of action against the principal, then this obligation shall be void. Otherwise this bond shall remain in full force and effect. The State of Iowa and any person(s) suffering such loss or damages shall have the right to bring an action on this bond against the principal or surety." *See* Iowa Bond No. GM209953.

c. "This bond shall be one continuing obligation and in no event shall the liability of the surety exceed the penal sum of Fifty Thousand Dollars ($50,000) for the aggregate of any claims occurring during the term of this bond." Iowa Bond No. GM209953.

d. "The surety shall have the right to terminate its obligation under this bond by filing notice with the Superintendent of Banking at least thirty (30) days prior to the effective date of such termination. Obligations of the surety arising prior to the effective date shall not be affected by the termination." Iowa Bond No. GM209953.

168. Therefore, under the terms of the Iowa Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Iowa laws on money transmission, and other applicable rules.

169. In connection with obtaining the Iowa Bond, Voyager performed all the terms and conditions required under the contract, including by paying a premium to GMIC in the amount of $7,500 and obtaining a license.

170. Voyager failed to faithfully abide by the provisions of Iowa Code Chapter 533C, and failed to satisfy loss suffered by purchasers or holders of instruments sold by Voyager.

171. Pursuant to Iowa Code. § 533C.701, "**[e]very licensee shall forward all money received for transmission in accordance with the terms of the agreement between the licensee and the sender** unless the licensee has a reasonable belief or a reasonable basis to believe that the sender may be a victim of fraud or that a crime or violation of law, rule, or regulation has occurred, is occurring, or may occur." Iowa Code § 533C.701 (emphasis added).

172. Voyager has breached the clear terms of the Iowa Bond and Iowa laws on money transmission, among other things, by failing to return customer funds, triggering GMIC's liability under the Iowa Bond.

173. In connection with Iowa Bond No. GM209953, GMIC is obliged to pay the Iowa Assignors for damages suffered.

174. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Iowa Assignors against GMIC. As of the date of this Complaint, there are 185 Iowa customers that assigned their claims to Plaintiff. The outstanding amount of the Iowa Assignors' claims exceeds the value of the Iowa Bond. The Iowa Assignors will not be made whole in the Chapter 11 Cases.

175. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Iowa Bond. Plaintiff has renewed those demands in May 2024 and February 2025.

GMIC has refused to make any payments to customers under the Iowa Bond and has thereby breached its obligation under this contract.

176. As a direct and proximate result of GMIC's breach of the Iowa Bond, the Iowa Assignors have been damaged in an amount to be determined at trial, but no less than $300,000.

**NEW MEXICO – BOND NO. GM211834**

**COUNT VIII**
**Breach of Contract**
[on behalf of New Mexico Assignors]

177. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

178. Voyager and GMIC are parties to the New Mexico Bond, which became effective on October 18, 2021 (the "New Mexico Bond").

179. The New Mexico Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $300,000. *See* New Mexico Bond No. GM211834.

180. Voyager obtained the New Mexico Bond, as required by N.M. Stat. Ann. § 58-32-203, in connection with its money transmission business in New Mexico.

181. In connection with obtaining the New Mexico Bond, Voyager paid a premium to GMIC in the amount of $7,500.

182. Under the clear and unambiguous terms of the New Mexico Bond, the New Mexico Bond also states that "ANY PERSON suffering loss or damages as a result of the Principal's failure to comply with its obligations under the Act, as described above, shall have the right to bring an action on this Bond." New Mexico Bond No. GM211834. New Mexico's Money Services Act similarly states that the bond "shall be in form and substance and from an issuer satisfactory to the

director and payable to New Mexico **for the benefit of any claimant against the licensee to secure the faithful performance of the obligations of the licensee with respect to money transmission.**" N.M. Stat. Ann. § 58-32-203 (emphasis added).

183. As part of the New Mexico Bond, GMIC also specifically agreed to be "indebted to the STATE OF NEW MEXICO in the form of a surety bond in the amount indicated above, for the payment of which, well and truly to be made, to the people of New Mexico pursuant to the Uniform Money Services Act, Section 58-32-203 NMSA, 1978 [the "New Mexico Act"]." New Mexico Bond No. GM211834. The New Mexico Bond also states that Voyager shall:

a. "Obtain and maintain a Money Transmission license, from the Director to act as a Money Transmission company as required by the Uniform Money Services Act (the [New Mexico] Act)."

b. "Faithfully conform to and abide by the provisions of the [New Mexico] Act."

c. "Honestly and faithfully apply all funds received and perform all obligations required by the [New Mexico] Act."

d. "Pay to the State or to any person entitled thereto, all money that becomes due and owing to the State or to the person under the provisions of the [New Mexico] Act and created by activities regulated pursuant to the [New Mexico] Act by the Principal or the Principal's agent or employee."

184. Therefore, under the terms of the New Mexico Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with New Mexico laws on money transmission, and other applicable rules.

185. Voyager triggered the New Mexico Bond by failing to adhere to the four conditions listed in the New Mexico Bond because it did not obtain a Money Transmission license, did not

faithfully conform to the provisions of the New Mexico Act as described below, did not apply all funds received because, among other things, it failed to return funds to its customers, and instead lent them out to third parties, and lastly, it did not pay to persons entitled to money due and owing, namely, the New Mexico Assignors.

186. Voyager has breached the clear terms of the New Mexico Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the New Mexico Bond.

187. In connection with New Mexico Bond No. GM211834, GMIC is obliged to pay the New Mexico Assignors for damages suffered.

188. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the New Mexico Assignors against GMIC. As of the date of this Complaint, there are 128 New Mexico customers that assigned their claims to Plaintiff. The outstanding amount of the New Mexico Assignors' claims exceeds the value of the New Mexico Bond. The New Mexico Assignors will not be made whole in the Chapter 11 Cases.

189. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the New Mexico Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the New Mexico Bond and has thereby breached its obligation under this contract.

190. As a direct and proximate result of GMIC's breach of the New Mexico Bond, the New Mexico Assignors have suffered damages in an amount to be determined at trial, but no less than $300,000.

## NORTH CAROLINA – BOND NO. GM209970

### COUNT IX
### Breach of Contract
[on behalf of North Carolina Assignors]

191. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

192. Voyager and GMIC are parties to the North Carolina Bond, which became effective on June 15, 2021 (the "North Carolina Bond").

193. The North Carolina Bond is a valid, enforceable, and binding contract pursuant to which GMIC specifically agreed to be bound in the principal amount of $150,000. *See* North Carolina Bond No. GM209970.

194. Voyager obtained the North Carolina Bond, as required by N.C. Gen. Stat. § 53-208.47, in connection with its money transmission business in North Carolina.

195. In connection with obtaining the North Carolina Bond, Voyager paid a premium to GMIC in the amount of $3,750.

196. As part of the North Carolina Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

197. Under the clear and unambiguous terms of the North Carolina Bond, the Bond is "for the use and benefit of claimants . . . to secure the faithful performance of the obligations of the Principal with respect to the receipt, handling, transmission, or payment of money or monetary value in connection with the sale and issuance of payment instruments, stored value obligations, or transmissions of money by the Principal . . . under the North Carolina Money Transmitters Act (the "[North Carolina] Act"), N.C. Gen. Stat. § 53-208.41, et seq." North Carolina Bond No. GM209970. The North Carolina Bond also states that if Voyager "as primary obligor, will faithfully perform all the obligations under the [North Carolina] Act with respect to the receipt,

handling, transmission, and payment of money or monetary value in connection with the sale and issuance of payment instruments, stored value obligations, or transmissions of money, and will pay to the State of North Carolina, and to any person entitled thereto, all money that becomes due and owing to such State, or to such person, because of any payment instrument, stored value obligation or transmission of money issued or transacted by the Principal . . . under the [North Carolina] Act, then this obligation will be void; otherwise the same will remain in full force and effect." *Id.*; *see also* N.C. Gen. Stat. § 53-208.47.

198. Therefore, under the terms of the North Carolina Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with North Carolina laws on money transmission, and other applicable rules.

199. The North Carolina Bond also states that the "bond shall run to the State for the benefit of any claimants against the Licensee for the faithful performance of the Licensee's obligations with respect to the receipt, handling, transmission, and payment of money. Claimants against the Licensee may themselves bring suit directly on the bond, or the Commissioner may bring suit on behalf of claimants, either in one action or in successive actions." North Carolina Bond No. GM209970. Another provision says that "[p]ursuant to N.C. Gen. Stat. § 53-208.47(i), the surety bond proceeds shall be deemed by operation of law to be held in trust for the exclusive benefit of the purchasers or holders of the Licensee's payment instruments, stored value obligations, and money transmissions in the event of the bankruptcy of the Licensee." *Id.*

200. Voyager has breached the clear terms of the North Carolina Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the North Carolina Bond.

201. In connection with North Carolina Bond No. GM209970, GMIC is obliged to pay the North Carolina Assignors for damages suffered.

202. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the North Carolina Assignors against GMIC. As of the date of this Complaint, there are 877 North Carolina customers that assigned their claims to Plaintiff. The outstanding amount of the North Carolina Assignors' claims exceeds the value of the North Carolina Bond. The North Carolina Assignors will not be made whole in the Chapter 11 Cases.

203. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the North Carolina Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the North Carolina Bond and has thereby breached its obligation under this contract.

204. As a direct and proximate result of GMIC's breach of the North Carolina Bond, the North Carolina Assignors have suffered damages in an amount to be determined at trial, but no less than $150,000.

**MARYLAND – BOND NO. GM209956**

**COUNT X**
**Breach of Contract**
[on behalf of Maryland Assignors]

205. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

206. Voyager and GMIC are parties to the Maryland Bond, which became effective on March 30, 2021 (the "Maryland Bond").

207. The Maryland Bond is a valid, enforceable, and binding contract pursuant to which GMIC specifically agreed to be bound in the principal amount of $150,000. *See* Maryland Bond No. GM209956.

208. The Maryland Bond provides that Voyager "is now or is about to become licensed by the Commissioner to engage in the business of money transmission, as provided by the laws of the State, as amended." *See* Maryland Bond No. GM209956. Voyager obtained such a license on or about March 4, 2022.

209. In connection with obtaining the Maryland Bond, Voyager paid a premium to GMIC in the amount of $3,750.

210. As part of the Maryland Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

211. Under the clear and unambiguous terms of the Maryland Bond, the Bond is "for the benefit of the State, and any individual who has been damaged by a violation of State law or regulation governing the business of money transmission, as amended, by the Principal or its authorized delegate, in the penal sum of $150,000. . . . [T]he Principal . . . shall, while this bond is in force and effect comply with all provisions of State and federal laws and regulations, as amended, governing the business of money transmission and shall fulfill all obligations to all parties to a money transmission; then this obligation shall be null and void; otherwise to remain in full force and effect." Maryland Bond No. GM209956. The Maryland Bond also says that GMIC's liability "[m]ay not be affected by the insolvency or bankruptcy of the Principal or by any misrepresentation, breach of warranty, failure to pay a premium, or other act or omission of the Principal or its authorized delegate; or license suspension." *Id.* Also under the Maryland Bond,

GMIC agreed to be liable if Voyager did not "fulfill all obligations to all parties to a money transmission." *Id.*

212. Therefore, under the terms of the Maryland Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Maryland laws on money transmission, and other applicable rules.

213. Pursuant to Md. Code Ann., Fin. Inst. § 12-412, "[w]ith an application for a new license, an applicant shall file a surety bond with the Commissioner. (2) The bond shall run to the Commissioner, as obligee, for the benefit of: ... (ii) **[a]ny individual who has been damaged by a violation of State law or regulation governing the business of money transmission committed by a licensee or an authorized delegate of a licensee. (3) The bond shall be:** ... (iii) **Conditioned that the licensee and any authorized delegate of the licensee shall: 1. [c]omply with all State and federal laws and** 7. **Maryland regulations governing the business of transmission; and 2. [f]ulfill all obligations to all parties to a money transmission**." Md. Code Ann., Fin. Inst. § 12-412 (emphasis added).

214. Voyager has breached the clear terms of the Maryland Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Maryland Bond.

215. In connection with Maryland Bond No. GM209956, GMIC is obliged to pay the Maryland Assignors for damages suffered.

216. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Maryland Assignors against GMIC. As of the date of this Complaint, there are 626 Maryland customers that assigned their claims to Plaintiff. The

outstanding amount of the Maryland Assignors' claims exceeds the value of the Maryland Bond. The Maryland Assignors will not be made whole in the Chapter 11 Cases.

217. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Maryland Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Maryland Bond and has thereby breached its obligation under this contract.

218. As a direct and proximate result of GMIC's breach of the Maryland Bond, the Maryland Assignors have suffered damages in an amount to be determined at trial, but no less than $150,000.

**NORTH DAKOTA – BOND NO. GM209960**

**COUNT XI**
**Breach of Contract**
[on behalf of North Dakota Assignors]

219. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

220. Voyager and GMIC are parties to the North Dakota Bond which became effective on March 30, 2021 (the "North Dakota Bond").

221. The North Dakota Bond is a valid, enforceable, and binding contract pursuant to which GMIC specifically agreed to be bound in the principal amount of $150,000. *See* North Dakota Bond No. GM209960.

222. Voyager obtained the North Dakota Bond, as required by N.D. Cent. Code § 13-09.1-33, in connection with its money transmission business in North Dakota.

223. In connection with obtaining the North Dakota Bond, Voyager paid a premium to GMIC in the amount of $3,750.

224. As part of the North Dakota Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

225. Under the clear and unambiguous terms of the North Dakota Bond, the Bond is "for the benefit of any person or persons who may have a cause of action against [GMIC and Voyager] as the Obligors of this instrument under the provisions of North Dakota Century Code Chapter 13-09 hereafter described . . . . [I]f Voyager and any employee or agent representing [Voyager], . . . faithfully conform to and abide by each and every provision of the Act and of all rules and regulations and orders lawfully made by the Commissioner, and pay to the State and to any such person or persons having a right of action against the Obligors any and all monies that may become due or owing to the State and to such person or persons from said Obligors under and by virtue of the provisions of the Act, then this obligation to be void; otherwise to remain in full force and effect until the Surety is released from liability by the Commissioner." North Dakota Bond No. GM209960. Also pursuant to the North Dakota Bond, GMIC agreed to "pay to . . . any such person or persons having a right of action against [GMIC] any and all monies that may become due or owing . . . to such person or persons from said Obligors under and by virtue of the provisions of the Act." *Id.*

226. Therefore, under the terms of the North Dakota Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with North Dakota laws on money transmission, and other applicable rules.

227. Pursuant to North Dakota Century Code, "[e]very **licensee shall refund to the sender** within ten days of receipt of the **sender's written request for a refund of any and all money received for transmission**." N.D. Cent. Code § 13-09.1-28 (emphasis added). This statute defines "'**[o]utstanding money transmission obligations**' [as] a. **[a]ny payment instrument or**

**stored value issued or sold by the licensee to a person located in the United States** or reported as sold by an authorized delegate of the licensee to a person that is located in the United States **that has not yet been paid or refunded by or for the licensee**, or escheated in accordance with applicable abandoned property laws." N.D. Cent. Code § 13-09.1-01(22) (emphasis added).

228. Voyager has breached the clear terms of the North Dakota Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the North Dakota Bond.

229. In connection with North Dakota Bond No. GM209960, GMIC is obliged to pay the North Dakota Assignors for damages suffered.

230. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the North Dakota Assignors against GMIC. As of the date of this Complaint, there are 43 North Dakota customers that assigned their claims to Plaintiff. The outstanding amount of their claims is currently slightly less than the value of the North Dakota Bond. The North Dakota Assignors will not be made whole in the Chapter 11 Cases.

231. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the North Dakota Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the North Dakota Bond and has thereby breached its obligation under this contract.

232. As a direct and proximate result of GMIC's breach of the North Dakota Bond, the North Dakota Assignors have suffered damages in an amount to be determined at trial, but no less than $125,607.

## GEORGIA – BOND NO. GM209969

**COUNT XII**
**Breach of Contract**
[on behalf of Georgia Assignors]

233. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

234. Voyager and GMIC are parties to the Georgia Bond, which became effective on June 15, 2021 (the "Georgia Bond").

235. The Georgia Bond provides that Voyager "has applied to the Georgia Department of Banking and Finance for a license to engage in the business of transmitting money or selling and issuing checks or other payment instruments in this State, whether through its own acts or the acts of any employee or agent of the principal under Official Code of Georgia Annotated ("O.C.G.A.") §§ 7-1-680 et seq." Georgia Bond No. GM209969. Voyager obtained such a license on or around February 12, 2021.

236. In connection with obtaining the Georgia Bond, Voyager paid a premium to GMIC in the amount of $2,500.

237. As part of the Georgia Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

238. Under the clear and unambiguous terms of the Georgia Bond, the Bond is "for the use and benefit of the State and of any claimant against the Principal. . . . [I]f [Voyager] shall comply with the provisions of the O.C.G.A. §§ 7-1-680 et seq., all regulations duly promulgated thereunder, and all other laws applicable to the conduct of its business, and shall pay any and all monies that may become due and owing to the State of Georgia that shall include, but not be limited to monies owed for fees, fines or penalties under and by virtue of the provisions of

O.C.G.A. §§ 7-1-680 et seq. or the Rules of the Department of Banking and Finance, and shall pay any and all monies that may become due and owing any person due to the violation of any such laws and regulations by the Principal through its own acts or the acts of any agent of the Principal, then this obligation will be void: otherwise the same will remain in full force and effect." Georgia Bond No. GM209969. Under the Georgia Bond, GMIC agreed to be liable in the event of a failure by Voyager to "pay any and all monies that may become due and owing any person due to the violation of any such laws and regulations by the Principal." *Id.*

239. Therefore, under the terms of the Georgia Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Georgia laws on money transmission, and other applicable rules.

240. Pursuant to Ga. Code Ann. § 7-1-683.2(b)(3), "[t]he bond shall be in a form satisfactory to the department and shall run to the State of Georgia for the benefit of the department or any payment instrument holders against the licensee or its agents. The condition of the bond shall require the licensee to pay any and all moneys for the benefit of any person damaged by noncompliance of a licensee or its agent with this article, with the rules and regulations enacted pursuant to this article, or with any condition of the bond **or to pay any and all moneys that may become due and owing any creditor of or claimant against the licensee arising out of the licensee's money transmission in this state,** whether through its own acts or the acts of an agent." Ga. Code Ann. § 7-1-683.2(b)(3) (emphasis added).

241. Voyager has breached the clear terms of the Georgia Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Georgia Bond.

242. In connection with Georgia Bond No. GM209969, GMIC is obliged to pay the Georgia Assignors for damages suffered.

243. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Georgia Assignors against GMIC. As of the date of this Complaint, there are 1,056 Georgia customers that assigned their claims to Plaintiff. The outstanding amount of the Georgia Assignors' claims exceeds the value of the Georgia Bond. The Georgia Assignors will not be made whole in the Chapter 11 Cases.

244. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Georgia Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Georgia Bond and has thereby breached its obligation under this contract.

245. As a direct and proximate result of GMIC's breach of the Georgia Bond, the Georgia Assignors have suffered damages in an amount to be determined at trial, but no less than $100,000.

## ALABAMA – BOND NO. GM211828

### COUNT XIII
### Breach of Contract
[on behalf of Alabama Assignors]

246. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

247. Voyager and GMIC are parties to the Alabama Bond, which became effective on October 12, 2021 (the "<u>Alabama Bond</u>").

248. Voyager obtained the Alabama Bond, as required by Ala. Code § 8-7A-7, in connection with its money transmission business in Alabama.

249. In connection with obtaining the Alabama Bond, Voyager paid a premium to GMIC in the amount of $2,500.

250. As part of the Alabama Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

251. Under the clear and unambiguous terms of the Alabama Bond, the Bond is "for the use and benefit of any creditor of the principal for any liability incurred in connection with the selling or issuing payment instruments, stored valued instruments, or receiving money or monetary value for transmission in the state of Alabama damaged by any failure to comply with the provisions of the Alabama Monetary Transmission Act or by any breach of the conditions of this obligation." Alabama Bond No. GM211828. The Alabama Bond also states that if Voyager "will faithfully conform to and abide by the provisions of the aforesaid ACT and will honestly and faithfully apply all funds received and perform all obligations and undertakings under the aforesaid ACT and will pay to the state and to any person all money that becomes due and owing to the State or to such person under the provisions of the aforesaid ACT because of any checks, drafts, traveler's checks, money orders, stored value or other instruments for the transmission or payment of money or monetary value for transmission and the receipt of money or monetary value for transmission in the state of Alabama by the aforesaid principal as a licensee under and by virtue of the provisions of the aforesaid ACT, then this obligation to be void; otherwise to remain in full force and effect." *Id.* The Alabama Bond also says that "any persons(s) having a claim under the conditions of this obligation may initiate suit in any court of competent jurisdiction against . . . the Surety upon this Bond." *Id.*

252. Therefore, under the terms of the Alabama Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Alabama laws on money transmission, and other applicable rules.

253. Pursuant to Ala. Code § 8-7A-7, "[a] licensee shall maintain a surety bond, . . . in an amount, determined by rule or order of the commission, **sufficient to secure faithful performance of the obligations of the licensee with respect to money transmission in Alabama.**" Ala. Code § 8-7A-7 (emphasis added).

254. Voyager has breached the clear terms of the Alabama Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Alabama Bond.

255. In connection with Alabama Bond No. GM211828, GMIC is obliged to pay the Alabama Assignors for damages suffered.

256. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Alabama Assignors against GMIC. As of the date of this Complaint, there are 272 Alabama customers that assigned their claims to Plaintiff. The outstanding amount of the Alabama Assignors' claims exceeds the value of the Alabama Bond. The Alabama Assignors will not be made whole in the Chapter 11 Cases.

257. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Alabama Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Alabama Bond and has thereby breached its obligation under this contract.

258. As a direct and proximate result of GMIC's breach of the Alabama Bond, the Alabama Assignors have suffered damages in an amount to be determined at trial, but no less than $100,000.

**NEBRASKA – BOND NO. GM209959**

**COUNT XIV**
**Breach of Contract**
[on behalf of Nebraska Assignors]

259. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

260. Voyager and GMIC are parties to the Nebraska Bond, which became effective on March 30, 2021 (the "Nebraska Bond").

261. The Nebraska Bond is a valid, enforceable, and binding contract pursuant to which GMIC specifically agreed to be bound in the principal amount of $100,000. *See* Nebraska Bond No. GM209959.

262. Voyager obtained the Nebraska Bond, as required by Neb. Rev. Stat. § 8–2731, in connection with its money transmission business in Nebraska.

263. In connection with obtaining the Nebraska Bond, Voyager paid a premium to GMIC in the amount of $2,500.

264. As part of the Nebraska Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

265. Under the clear and unambiguous terms of the Nebraska Bond, the Bond is "for the benefit of any person dealing with the Principal who may have a cause of action against [it] under the provisions of the Nebraska Money Transmitters Act, Neb. Rev. Stat. Sections 8-2701 to 8-2748 ("the [Nebraska] Act") hereafter described . . . to be paid to the State of Nebraska or other

person. . . . [I]f [Voyager] . . . faithfully conform to and abide by each and every provision of the Act and of all rules and regulations and orders lawfully made by the Director, and pay to the State and to any such person or persons having a right of action against the Obligors any and all monies that may become due or owing to the State and to such person or persons from said Obligors under and by virtue of the provisions of the Act, then this obligation to be void; otherwise to remain in full force and effect until the Surety is released from liability by the Director." Nebraska Bond No. GM209959. The Nebraska Bond also provides that "any person suffering loss or damage, has the right to proceed on this bond against the Principal or Surety hereon or both to recover any and all moneys that may become due or owing." *Id.*

266. Therefore, under the terms of the Nebraska Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Nebraska laws on money transmission, and other applicable rules.

267. Pursuant to the Nebraska Act, "**[e]very licensee shall refund to the sender** within ten days after receipt of the sender's written request for a refund of **any and all money received for transmission**." Neb. Rev. Stat. § 8–2727(2) (emphasis added).

268. Voyager has breached the clear terms of the Nebraska Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Nebraska Bond.

269. In connection with Nebraska Bond No. GM209959, GMIC is obliged to pay the Nebraska Assignors for damages suffered.

270. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Nebraska Assignors against GMIC. As of the date of this Complaint, there are 153 Nebraska customers that assigned their claims to Plaintiff. The

outstanding amount of the Nebraska Assignors' claims exceeds the value of the Nebraska Bond. The Nebraska Assignors will not be made whole in the Chapter 11 Cases.

271. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Nebraska Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Nebraska Bond and has thereby breached its obligation under this contract.

272. As a direct and proximate result of GMIC's breach of the Nebraska Bond, the Nebraska Assignors have suffered damages in an amount to be determined at trial, but no less than $100,000.

**MAINE – BOND NO. GM206454**

**COUNT XV**
**Breach of Contract**
[on behalf of Maine Assignors]

273. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

274. Voyager and GMIC are parties to the Maine Bond, which became effective on March 24, 2021 (the "Maine Bond").

275. The Maine Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $100,000. *See* Maine Bond No. GM206454.

276. Voyager obtained the Maine Bond, as required by Me. Rev. Stat. Ann. tit. 32, § 6100-S, in connection with its money transmission business in Maine.

277. In connection with obtaining the Maine Bond, Voyager paid a premium to GMIC in the amount of $2,500.

278. As part of the Maine Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

279. Under the clear and unambiguous terms of the Maine Bond, the Bond is "for use of any person or persons who may have a cause of action against the Principal of this bond under the provisions of the act under which this bond is given . . . to be paid to the said person or persons as aforesaid. . . . if [Voyager] shall faithfully perform the duties and obligations pertaining to the transmission of money, . . . pursuant to 32 M.R.S.A. § 6101 et seq., to be conducted in accordance with the tenure of the license of said business issued by the Superintendent of the Bureau of Consumer Credit Protection of the State of Maine under the authority of, and as provided in Title 32 M.R.S.A. § 6101 et seq., and shall conform and abide by each and every applicable provision of 32 M.R.S.A. § 6101 et seq., and to all rules and regulations lawfully made by the Superintendent hereunder and shall pay to the State and to any such persons any and all monies that may become due or owing to the State or to such persons from said Principal, under and by virtue of the provisions of 32 M.R.S.A. § 6101 et seq., then this obligation shall become void; otherwise it shall be and remain in full force and effect." Maine Bond No. GM206454.

280. Therefore, under the terms of the Maine Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Maine laws on money transmission, and other applicable rules.

281. Pursuant to Maine's money transmitter law, "[a] licensee shall forward all money received for transmission in accordance with the terms of the agreement between the licensee and the sender." Me. Rev. Stat. Ann. tit. 32, § 6100-L.

282. Further, Maine's money transmitter law says that a "licensee shall refund to the sender within 10 days of receipt of the sender's written request for a refund all money received for transmission." Me. Rev. Stat. Ann. tit. 32, § 6100-M.

283. Voyager has breached the clear terms of the Maine Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Maine Bond.

284. In connection with Maine Bond No. GM206454, GMIC is obliged to pay the Maine Assignors for damages suffered.

285. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Maine Assignors against GMIC. As of the date of this Complaint, there are 72 Maine customers that assigned their claims to Plaintiff. The outstanding amount of the Maine Assignors' claims exceeds the value of the Maine Bond. The Maine Assignors will not be made whole in the Chapter 11 Cases.

286. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Maine Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Maine Bond and has thereby materially breached its obligation under this contract.

287. As a direct and proximate result of GMIC's breach of the Maine Bond, the Maine Assignors have suffered damages in an amount to be determined at trial, but no less than $100,000.

## NEW HAMPSHIRE – BOND NO. GM211831

### COUNT XVI
### Breach of Contract
[on behalf of the New Hampshire Assignors]

288. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

289. Voyager and GMIC are parties to the New Hampshire Bond, which became effective on or around October 18, 2021 (the "New Hampshire Bond").

290. The New Hampshire Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $100,000. *See* New Hampshire Bond No. GM211831.

291. The New Hampshire Bond provides that Voyager "has applied for a license as a money transmitter under the provisions of New Hampshire Revised Statutes Annotated 399-G from and after the date hereof for the license period and continuous during the licensing period, including renewal periods, or until cancelled[.]" New Hampshire Bond No. GM211831. On or around April 21, 2022, Voyager applied for, and obtained a money transmitter license.

292. In connection with obtaining the New Hampshire Bond, Voyager paid a premium to GMIC in the amount of $2,500.

293. As part of the New Hampshire Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

294. Under the clear and unambiguous terms of the New Hampshire Bond, Voyager was "required to **faithfully comply with any and all provisions of NH RSA 399-G, as now or hereafter amended**, and any and all rules, regulations and orders issued or hereafter to be issued by the Bank Commissioner of the State of New Hampshire; and WHEREAS, this bond provides

for suit thereon by any person who has a cause of action under NH RSA 399-G and, if the Bank Commissioner by rule or order requires, by any person who has a cause of action not arising under the chapter." New Hampshire Bond No. GM211831 (emphasis added).

295. Therefore, under the terms of the New Hampshire Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with the N.H. Rev. Stat. Ann. 399-G, and other applicable rules.

296. Pursuant to N.H. Rev. Stat. Ann. § 399-G:23, "**[e]very licensee shall forward all money received for transmission in accordance with the terms of the agreement between the licensee and the sender** unless the licensee has a reasonable belief or a reasonable basis to believe that the sender may be a victim of fraud or that a crime or violation of law, rule, or regulation has occurred, is occurring, or may occur." (emphasis added).

297. Further, pursuant to N.H. Rev. Stat. Ann. § 399-G:24, "**[e]very licensee shall refund to the sender** within 10 days of receipt of the sender's written request for a refund of any and all money received for transmission." (emphasis added).

298. Voyager has breached the clear terms of the New Hampshire Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the New Hampshire Bond.

299. In connection with New Hampshire Bond No. GM211831, GMIC is obliged to pay the New Hampshire Assignors for damages suffered.

300. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the New Hampshire Assignors against GMIC. As of the date of this Complaint, there are 155 New Hampshire customers that assigned their claims to Plaintiff.

The outstanding amount of the New Hampshire Assignors' claims exceeds the value of the New Hampshire Bond, and the New Hampshire Assignors will not be made whole in the Chapter 11 Cases.

301. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the New Hampshire Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the New Hampshire Bond and has thereby breached its obligation under this contract.

302. As a direct and proximate result of GMIC's breach, the New Hampshire Assignors have suffered damages in an amount to be determined at trial, but no less than $100,000.

**SOUTH DAKOTA– BOND NO. GM209972**

**COUNT XVII**
**Breach of Contract**
[on behalf of the South Dakota Assignors]

303. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

304. Voyager and GMIC are parties to the South Dakota Bond, which became effective on or around June 15, 2021 (the "South Dakota Bond").

305. The South Dakota Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $100,000. *See* South Dakota Bond No. GM209972.

306. The South Dakota Bond provides that Voyager "has applied to the South Dakota Division of Banking (the Division) for licensure as a Money Transmitter as provided by law under SDCL 51A-17 et. seq." South Dakota Bond No. GM209972. On or around November 2, 2020, Voyager applied for, and obtained a money transmitter license.

307. In connection with obtaining the South Dakota Bond, Voyager paid a premium to GMIC in the amount of $2,500.

308. As part of the South Dakota Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

309. Under the clear and unambiguous terms of the South Dakota Bond, "if **the Licensee will faithfully conform to and abide by the provisions of said Law and will pay to any claimant of the Licensee all moneys that become due and owing to such claimant** because of any check, draft, money order, personal money order or other instrument for the transmission or payment of money issued and sold by Licensee or any of his agents in the State of South Dakota, then this obligation will be void; otherwise the same will remain in full force and effect." South Dakota Bond No. GM209972 (emphasis added).

310. Therefore, under the terms of the South Dakota Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with South Dakota laws on money transmission, and other applicable rules.

311. Pursuant to S.D. Codified Laws § 51A-17-93, "**[e]very licensee shall forward all money received for transmission in accordance with the terms of the agreement** between the licensee and the sender unless the licensee has a reasonable belief or a reasonable basis to believe that the sender may be a victim of fraud or that a crime or violation of law, rule, or regulation has occurred, is occurring, or may occur." (emphasis added).

312. Further, pursuant to S.D. Codified Laws § 51A-17-94, "**[e]very licensee shall refund to the sender** within ten days of receipt of the sender's written request for a refund of any and all money received for transmission." (emphasis added).

313. Voyager has breached the clear terms of the South Dakota Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the South Dakota Bond.

314. In connection with South Dakota Bond No. GM209972, GMIC is obliged to pay the South Dakota Assignors for damages suffered.

315. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the South Dakota Assignors against GMIC. As of the date of this Complaint, there are 61 South Dakota customers that assigned their claims to Plaintiff. The outstanding amount of the South Dakota Assignors' claims exceeds the value of the South Dakota Bond, and the South Dakota Assignors will not be made whole in the Chapter 11 Cases.

316. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the South Dakota Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the South Dakota Bond and has thereby breached its obligation under this contract.

317. As a direct and proximate result of GMIC's breach, the South Dakota Assignors have suffered damages in an amount to be determined at trial, but no less than $100,000.

**ILLINOIS – BOND NO. GM211835**

**COUNT XVIII**
**Breach of Contract**
[on behalf of the Illinois Assignors]

318. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

319. Voyager and GMIC are parties to the Illinois Bond, which became effective on or around October 21, 2021, pursuant to which GMIC agreed to be bound in the principal amount of $210,000. Voyager and GMIC subsequently executed a Decrease Rider to the Illinois Bond, effective as of December 29, 2022, which decreased the Illinois Bond amount to $50,000 (together, the "Illinois Bond").

320. The Illinois Bond and the Decrease Rider are valid, enforceable, and binding contracts, pursuant to which GMIC specifically agreed to be bound in the principal amount of $50,000. *See* Illinois Bond No. GM211835.

321. The Illinois Bond provides that Voyager "has applied for a license for the term ending December 31, 2022 to transact the business of selling or issuing payment instruments, transmitting money, or exchanging, for compensation, payment instruments or money of the United States government or a foreign government to or from money of another government, in accordance with the provisions of the Transmitters of Money Act." Illinois Bond No. GM211835. On or around February 7, 2019, Voyager applied for and obtained a money transmitter license.

322. In connection with obtaining the Illinois Bond, Voyager paid a premium to GMIC in the amount of $5,250.

323. As part of the Illinois Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

324. Under the clear and unambiguous terms of the Illinois Bond, "if [Voyager] shall [] faithfully conform to and abide by each and every provision of the [Illinois Transmitters of Money Act] and of all rules, regulations and directions lawfully made by the Director of Financial Institutions thereunder, and will pay to the State and to any person or persons any and all moneys that may be come due and owing to the State and to such person or persons from said obligors,

under and by virtue of the provisions of said Act, then this obligation to be void; otherwise to remain in full force and effect." Illinois Bond No. GM211835.

325. Therefore, under the terms of the Illinois Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Illinois laws on money transmission, and other applicable rules.

326. Pursuant to 205 Ill. Comp. Stat. 658/10(a), the bond "must be in a form satisfactory to the Secretary … [and] shall run to the State of Illinois for the benefit of any claimant against the applicant or licensee with respect to the receipt, handling, transmission, and payment of money by the licensee or authorized seller in connection with the licensed operations."

327. Voyager has breached the clear terms of the Illinois Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Illinois Bond.

328. In connection with the Illinois Bond No. GM211835, GMIC is obliged to pay the Illinois Assignors for damages suffered.

329. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Illinois Assignors against GMIC. As of the date of this Complaint, there are 1,371 Illinois customers that assigned their claims to Plaintiff. The outstanding amount of the Illinois Assignors' claims exceeds the value of the Illinois Bond, and the Illinois Assignors will not be made whole in the Chapter 11 Cases.

330. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Illinois Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Illinois Bond and has thereby breached its obligation under this contract.

331. As a direct and proximate result of GMIC's breach, the Illinois Assignors have suffered damages in an amount to be determined at trial, but no less than $50,000.

**SOUTH CAROLINA – BOND NO. GM209962**

**COUNT XIX**
**Breach of Contract**
[on behalf of the South Carolina Assignors]

332. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

333. Voyager and GMIC are parties to the South Carolina Bond, which became effective on or around March 30, 2021 (the "South Carolina Bond").

334. The South Carolina Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $50,000. *See* South Carolina Bond No. GM209962.

335. Voyager obtained the South Carolina Bond, as required by S.C. Code Ann. § 35-11-215, in connection with its money transmission business in South Carolina.

336. In connection with obtaining the South Carolina Bond, Voyager paid a premium to GMIC in the amount of $1,250.

337. As part of the South Carolina Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

338. Under the clear and unambiguous terms of the South Carolina Bond, "if [Voyager] **faithfully conform[s] to and abide[s] by each and every provision of the Act and of all rules and regulations and orders lawfully made by the Commissioner, and pay to the State and to any such person or persons having a right of action against the Obligors any and all monies that may become due or owing to the State and to such person or persons** from said Obligors

under and by virtue of the provisions of the Act, then this obligation will be void; otherwise the same will remain in full force and effect until the Surety is released from liability by the Commissioner[.]" South Carolina Bond No. GM209962 (emphasis added).

339. The South Carolina Bond is "**for the benefit of any claimants against the Licensee for the faithful performance of the Licensee's obligations** with respect to the receipt, handling, transmission and payment of money." South Carolina Bond No. GM209962 (emphasis added).

340. Therefore, under the terms of the South Carolina Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with South Carolina laws on money transmission, and other applicable rules.

341. Pursuant to S.C. Code Ann. § 35-11-535, "**[e]very licensee shall forward all money received for transmission in accordance with the terms of the agreement** between the licensee and the sender unless the licensee has a reasonable belief or a reasonable basis to believe that the sender may be a victim of fraud or that a crime or violation of law, rule, or regulation has occurred, is occurring, or may occur." (emphasis added).

342. Further, pursuant to S.C. Code Ann. § 35-11-540, "**[e]very licensee shall refund to the sender** within ten days of receipt of the sender's written request for a refund of any and all money received for transmission." (emphasis added).

343. Voyager has breached the clear terms of the South Carolina Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the South Carolina Bond.

344. In connection with South Carolina Bond No. GM209962, GMIC is obliged to pay the South Carolina Assignors for damages suffered.

345. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the South Carolina Assignors against GMIC. As of the date of this Complaint, there are 402 South Carolina customers that assigned their claims to Plaintiff. The outstanding amount of the South Carolina Assignors' claims exceeds the value of the South Carolina Bond, and the South Carolina Assignors will not be made whole in the Chapter 11 Cases.

346. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the South Carolina Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the South Carolina Bond and has thereby breached its obligation under this contract.

347. As a direct and proximate result of GMIC's breach, the South Carolina Assignors have suffered damages in an amount to be determined at trial, but no less than $50,000.

## RHODE ISLAND – BOND NO. GM209961

### COUNT XX
### Breach of Contract
[on behalf of the Rhode Island Assignors]

348. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

349. Voyager and GMIC are parties to the Rhode Island Bond, which became effective on or around March 30, 2021 (the "<u>Rhode Island Bond</u>").

350. The Rhode Island Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $50,000. *See* Rhode Island Bond No. GM209961.

351. The Rhode Island Bond provides that Voyager "is required to execute one bond payable to said State of Rhode Island in the penal sum of Fifty Thousand Dollars ($50,000) plus any additional sum as may be required pursuant to Title 19, Chapter 14-6 from which it shall conduct the business provided for by Title 19, Chapters 14 and 14.3 of the General Laws of Rhode Island 1956, as amended, and file the same with the Director of Business Regulation." Rhode Island Bond No. GM209961 (emphasis in original).

352. In connection with obtaining the Rhode Island Bond, Voyager paid a premium to GMIC in the amount of $1,250.

353. As part of the Rhode Island Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

354. Under the clear and unambiguous terms of the Rhode Island Bond, Voyager "**shall conform to and abide by each and every provision of said Chapters, the title of which is above set forth, and all amendments thereto** and all rules and regulations lawfully made by the Director of Business Regulation hereunder, **and shall pay** to said State and **to any such person or persons any and all monies that may become due or owing to said State and/or to such person or persons from said obligor,** under and by virtue of the provisions of said Chapters[.]" Rhode Island Bond No. GM209961 (emphasis added).

355. Therefore, under the terms of the Rhode Island Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Rhode Island laws on money transmission, and other applicable rules.

356. Pursuant to R.I. Gen. Laws § 19-14.3-3.8, "**[n]o person required to be licensed under this chapter shall**: (1) **[f]ail to remit all money or monetary value received for transmission pursuant to this chapter**, or give instructions committing equivalent money or

monetary value to the person designated by the sender within ten (10) days after receipt by the licensee unless otherwise directed by the sender." (emphasis added).

357. Voyager has breached the clear terms of the Rhode Island Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Rhode Island Bond.

358. In connection with Rhode Island Bond No. GM209961, GMIC is obliged to pay the Rhode Island Assignors for damages suffered.

359. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Rhode Island Assignors against GMIC. As of the date of this Complaint, there are 117 Rhode Island customers that assigned their claims to Plaintiff. The outstanding amount of the Rhode Island Assignors' claims exceeds the value of the Rhode Island Bond, and the Rhode Island Assignors will not be made whole in the Chapter 11 Cases.

360. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Rhode Island Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Rhode Island Bond and has thereby breached its obligation under this contract.

361. As a direct and proximate result of GMIC's breach, the Rhode Island Assignors have suffered damages in an amount to be determined at trial, but no less than $50,000.

## WASHINGTON D.C. – BOND NO. GM211830

### COUNT XXI
### Breach of Contract
[on behalf of the Washington D.C. Assignors]

362. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

363. Voyager and GMIC are parties to the Washington D.C. Bond, which became effective on or around on October 12, 2021 (the "Washington D.C. Bond").

364. The Washington D.C. Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $50,000. *See* Washington D.C. Bond No. GM211830.

365. Voyager obtained the Washington D.C. Bond, as required by D.C. Code § 26–1007, in connection with its money transmission business in Washington D.C.

366. In connection with obtaining the Washington D.C. Bond, Voyager paid a premium to GMIC in the amount of $1,250.

367. As part of the Washington D.C. Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

368. Under the clear and unambiguous terms of the Washington D.C. Bond, GMIC is "held and firmly bound unto the District of Columbia for the use and benefit of the District and of any creditor or claimant against the principal or his agents in the penal sum of $50,000…[and] the conditions, characteristics, and requirements of the [GMIC's obligations] are defined and set forth in the D.C. Official Code and D.C. Municipal Regulations duly promulgated thereunder, and as applied under the District of Columbia Money Transmitter Act of 2000, D.C. Official Code § 26-1001 et seq. and 26-C D.C.M.R. §2200 et seq." Washington D.C. Bond No. GM211830.

369. Therefore, under the terms of the Washington D.C. Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Washington D.C. laws on money transmission, and other applicable rules.

370. Voyager has breached the clear terms of the Washington D.C. Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Washington D.C. Bond.

371. In connection with Washington D.C. Bond No. GM211830, GMIC is obliged to pay the Washington D.C. Assignors for damages suffered.

372. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of Washington D.C. Assignors against GMIC. As of the date of this Complaint, there are 76 Washington D.C. customers that assigned their claims to Plaintiff. The outstanding amount of the Washington D.C. Assignors' claims exceeds the value of the Washington D.C. Bond, and the Washington D.C. Assignors will not be made whole in the Chapter 11 Cases.

373. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Washington D.C. Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Washington D.C. Bond and has thereby breached its obligation under this contract.

374. As a direct and proximate result of GMIC's breaches of the Washington D.C. Bond, the Washington D.C. Assignors have been damaged in an amount to be determined at trial, but no less than $50,000.

**ALASKA – BOND NO. GM209973**

**COUNT XXII**
**Breach of Contract**
[on behalf of the Alaska Assignors]

375. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

376. Voyager and GMIC are parties to the Alaska Bond, which became effective on or around June 15, 2021 (the "Alaska Bond").

377. The Alaska Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $40,000. *See* Alaska Bond No. GM209973.

378. Voyager obtained the Alaska Bond, as required by Alaska Stat. § 06.55.104, in connection with its application for a money transmitter license. On or around December 3, 2020, Voyager applied for, and obtained a money transmitter license.

379. In connection with obtaining the Alaska Bond, Voyager paid a premium to GMIC in the amount of $1,000.

380. As part of the Alaska Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

381. Under the clear and unambiguous terms of the Alaska Bond, the Bond "secures the **faithful performance of the obligations of the principal as a money transmission licensee** […] If the principal fully conforms to and abides by the provisions of the said Act and of all rules and regulations lawfully made by the licensing official thereunder **and will pay to the State of Alaska and to any person or persons who may have a cause of action against the obligor of said bond under the provision of said Act any and all moneys that may become due or owning to the**

**State or to such person or persons from said obligor**." Alaska Bond No. GM209973 (emphasis added).

382. Therefore, under the terms of the Alaska Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Alaska laws on money transmission, and other applicable rules. Pursuant to Alaska Stat. § 06.55.820, "[w]ithin 10 business days after receiving the money or equivalent value for money transmission, unless otherwise ordered by the customer or unless the money transmission licensee has reason to believe a crime has occurred, is occurring, or may occur as a result of the money transmission, **a money transmission licensee shall (1) transmit after the deduction of fees the monetary equivalent of all money or equivalent value received for the money transmission**; or (2) issue instructions making the money or its monetary equivalent available to the person designated by the customer." (emphasis added). Further, pursuant to Alaska Stat. Ann. § 06.55.840, "**[w]ithin 10 days after receiving a written request for a refund, a money transmission licensee shall refund to a customer money** equal to the money or equivalent value received from the customer for a money transmission." (emphasis added).

383. Voyager has breached the clear terms of the Alaska Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Alaska Bond.

384. Alaska Stat. § 06.55.104 provides, "[a] claimant against a money transmission licensee may maintain an action on the bond."

385. In connection with Alaska Bond No. GM209973, GMIC is obliged to pay the Alaska Assignors for damages suffered.

386. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's

bankruptcy, including those of the Alaska Assignors against GMIC. As of the date of this Complaint, there are 45 Alaska customers that assigned their claims to Plaintiff. The outstanding amount of the Alaska Assignors' claims exceeds the value of the Alaska Bond, and the Alaska Assignors will not be made whole in the Chapter 11 Cases.

387. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Alaska Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Alaska Bond and has thereby breached its obligation under this contract.

388. As a direct and proximate result of GMIC's breach of the Alaska Bond, the Alaska Assignors have suffered damages in an amount to be determined at trial, but no less than $40,000.

## ARIZONA – BOND NO. GM209975

### COUNT XXIII
### Breach of Contract
[on behalf of the Arizona Assignors]

389. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

390. Voyager and GMIC are parties to the Arizona Bond, which became effective on or around October 16, 2021 (the "Arizona Bond").

391. The Arizona Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $25,000. *See* Arizona Bond No. GM209975.

392. The Arizona Bond provides that, Voyager "has made application to the Department of Insurance and Financial Institutions of the State of Arizona for license as a [] Money Transmitter

within the meaning of Title 6, Chapter 12. Art. I, Arizona Revised Statutes[.]" On or around December 4, 2018, Voyager applied for, and obtained a money transmitter license.

393. In connection with obtaining the Arizona Bond, Voyager paid a premium to GMIC in the amount of $625.

394. As part of the Arizona Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

395. Under the clear and unambiguous terms of the Arizona Bond, "if the Principal **shall strictly, honestly and faithfully comply with the provisions of Title, Chapter and Article of the Arizona Revised Statutes (as checked above), and shall pay all damages suffered by any person injured by the wrongful act, default, fraud or misrepresentation of the licensee** or his employees, or both, growing out of any transaction governed by the provisions of such statutes, then this obligation shall be void; otherwise to remain in full force and effect." *Id.* (emphasis added).

396. Therefore, under the terms of the Arizona Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with the Arizona Money Transmitter Act, and other applicable rules.

397. Pursuant to Ariz. Rev. Stat. § 6-1224, "**[e]very licensee shall forward all money received for transmission in accordance with the terms of the agreement** between the licensee and the sender unless the licensee has a reasonable belief or a reasonable basis to believe that the sender may be a victim of fraud or that a crime or violation of law has occurred, is occurring or may occur." (emphasis added).

398. Further, pursuant to Ariz. Rev. Stat. § 6-1225, "**every licensee shall refund to the sender within ten days** after receipt of the sender's written request for a refund of money received for transmission." (emphasis added).

399. Voyager has breached the clear terms of the Arizona Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Arizona Bond.

400. In connection with Arizona Bond No. GM209975, GMIC is obliged to pay the Arizona Assignors for damages suffered.

401. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Arizona Assignors against GMIC. As of the date of this Complaint, there are 706 Arizona customers that assigned their claims to Plaintiff. The outstanding amount of the Arizona Assignors' claims exceeds the value of the Arizona Bond, and the Arizona Assignors will not be made whole in the Chapter 11 Cases.

402. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Arizona Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Arizona Bond and has thereby breached its obligation under this contract.

403. As a direct and proximate result of GMIC's breach, the Arizona Assignors have suffered damages in an amount to be determined at trial, but no less than $25,000.

**MINNESOTA – BOND NO. GM211833**

**COUNT XXIV**
**Breach of Contract**
[on behalf of the Minnesota Assignors]

404. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

405. Voyager and GMIC are parties to the Minnesota Bond, which became effective on or around October 18, 2021 (the "Minnesota Bond").

406. The Minnesota Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $25,000. *See* Minnesota Bond No. GM211833.

407. Voyager obtained the Minnesota Bond, as required by Minn. Stat. § 53B.60, in connection with its money transmission activities in Minnesota.

408. In connection with obtaining the Minnesota Bond, Voyager paid a premium to GMIC in the amount of $625.

409. As part of the Minnesota Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

410. Under the clear and unambiguous terms of the Minnesota Bond, the Bond is entered **"to secure the compliance by [Voyager] with terms of Minnesota Statutes**, Section 53B.01 to 53B.27, and any other legal obligations arising out of the [Voyager]'s conduct as a money transmitter. [] This bond is **for the benefit of . . . all persons suffering damages by reason of Principal's failure to comply with Minnesota Statutes,** Section 53B.02 to 53B.27, **or other legal obligations arising out of Principal's conduct as a money transmitter**. [] If the Principal shall violate Minnesota Statutes, Section 53B.02 to 53B.27, or other legal obligations arising out

of its conduct as a money transmitter, **. . . any person damaged as a result of such violation shall have . . . a right of action on this bond in the name of the injured party for loss sustained by the injured party**." Minnesota Bond No. GM211833 (emphasis added).

411. Therefore, under the terms of the Minnesota Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Minnesota laws on money transmission, and other applicable rules.

412. Pursuant to Minn. Stat. § 53B.54, "**[e]very licensee must forward all money received for transmission in accordance with the terms of the agreement** between the licensee and the sender, unless the licensee has a reasonable belief or a reasonable basis to believe that the sender may be a victim of fraud or that a crime or violation of law, rule, or regulation has occurred, is occurring, or may occur." (emphasis added).

413. Further, pursuant to Minn. Stat. § 53B.55, "**[a] licensee must refund to the sender within ten days** of the date the licensee receives the sender's written request for a refund of any and all money received for transmission." (emphasis added).

414. Voyager has breached the clear terms of the Minnesota Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Minnesota Bond.

415. In connection with Minnesota Bond No. GM211833, GMIC is obligated to pay the Minnesota Assignors for damages suffered.

416. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Minnesota Assignors against GMIC. As of the date of this Complaint, there are 474 Minnesota customers that assigned their claims to Plaintiff. The

outstanding amount of the Minnesota Assignors' claims exceeds the value of the Minnesota Bond, and the Minnesota Assignors will not be made whole in the Chapter 11 Cases.

417. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Minnesota Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Minnesota Bond and has thereby breached its obligation under this contract.

418. As a direct and proximate result of GMIC's breach, the Minnesota Assignors have suffered damages in an amount to be determined at trial, but no less than $25,000.

## LOUISIANA – BOND NO. GM209955

### COUNT XXV
### Breach of Contract
[on behalf of the Louisiana Assignors]

419. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

420. Voyager and GMIC are parties to the Louisiana Bond, which became effective on or around March 30, 2021 (the "Louisiana Bond").

421. The Louisiana Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $25,000. *See* Louisiana Bond No. GM209955.

422. The Louisiana Bond provides that, Voyager "has applied to the Commissioner of Financial Institutions of Louisiana for a license to conduct the sale of checks or money transmission as provided in "The Sale of Checks and Money Transmission Act", R.S. 6:1031, et seq., and shall pay to the State of Louisiana and to any person or persons any and all monies that may be due and owing to the Louisiana Office of Financial Institutions or to such person or

persons[.]" On or around November 2, 2020, Voyager applied for, and obtained a money transmitter license.

423. In connection with obtaining the Louisiana Bond, Voyager paid GMIC $625 in premiums.

424. As part of the Louisiana Bond, GMIC also agreed to be held jointly and severally liable with Voyager.

425. Under the clear and unambiguous terms of the Louisiana Bond, Voyager and GMIC are "**firmly bound to the Office of Financial Institutions for the use of the state and of any person who may have a cause of action against the principal under** 'The Sale of Checks and Money Transmission Act', R.S. 6:1031, et seq., in the full sum of Twenty-Five Thousand Dollars ($25,000)." Louisiana Bond No. GM209955 (emphasis added).

426. Therefore, under the terms of the Louisiana Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Louisiana laws on money transmission, and other applicable rules.

427. Pursuant to La. Rev. Stat. § 6:1056, "[e]very money transmitter licensee and its agents shall transmit the monetary equivalent of all money or equivalent value received from a consumer for transmission, net of any fees, or issue instructions committing the money or its monetary equivalent, to the person designated by the consumer, **or return such amount to the consumer**, within ten business days after receiving the money or equivalent value, unless otherwise ordered by the consumer, accepted under the terms of a contract for stored value or when the transmission is for the payment of goods or services, or unless the licensee or its agent has reasonable cause to believe that a violation of law has occurred, is occurring, or will occur in connection with transmitting the money." (emphasis added).

428. Voyager has breached the clear terms of the Louisiana Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Louisiana Bond.

429. In connection with Louisiana Bond No. GM209955, GMIC is obliged to pay the Louisiana Assignors for damages suffered.

430. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Louisiana Assignors against GMIC. As of the date of this Complaint, there are 299 Louisiana customers that assigned their claims to Plaintiff. The outstanding amount of the Louisiana Assignors' claims exceeds the value of the Louisiana Bond, and the Louisiana Assignors will not be made whole in the Chapter 11 Cases.

431. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Louisiana Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Louisiana Bond and has thereby breached its obligation under this contract.

432. As a direct and proximate result of GMIC's breach, the Louisiana Assignors have suffered damages in an amount to be determined at trial, but no less than $25,000.

## OREGON – BOND NO. GM211827

### COUNT XXVI
### Breach of Contract
[on behalf of the Oregon Assignors]

433. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

434. Voyager and GMIC are parties to the Oregon Bond, which became effective on or around October 12, 2021 (the "Oregon Bond").

435. The Oregon Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $25,000. *See* Oregon Bond No. GM211827.

436. The Oregon Bond provides that, Voyager "has applied to the director of the Department of Consumer and Business Services, State of Oregon, for a license to conduct a money transmitter's business as provided in ORS Chapter 717 and is required to furnish a bond to cover the operation of the business during each annual license period." Oregon Bond No. GM211827. On or around January 31, 2022, Voyager applied for, and obtained a money transmitter license.

437. In connection with obtaining the Oregon Bond, Voyager paid a premium to GMIC in the amount of $625.

438. As part of the Oregon Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

439. Under the clear and unambiguous terms of the Oregon Bond, Voyager is obligated to "**faithfully conform to and abide by the provisions of the Oregon Money Transmitters Act** and all rules adopted by the director of the Department of Consumer and Business Services**, and [] pay to this state and to any person aggrieved by the misconduct of the licensee or of the licensees violation of any law, any and all monies that may become due or owing to the state or to such other person from the principal under and by virtue of the provisions of ORS Chapter 717**[.]" (emphasis added).

440. Therefore, under the terms of the Oregon Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Oregon laws on money transmission, and other applicable rules.

441. Voyager has breached the clear terms of the Oregon Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Oregon Bond.

442. In connection with Oregon Bond No. GM211827, GMIC is obliged to pay the Oregon Assignors for damages suffered.

443. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Oregon Assignors against GMIC. As of the date of this Complaint, there are 422 Oregon customers that assigned their claims to Plaintiff. The outstanding amount of the Oregon Assignors' claims exceeds the value of the Oregon Bond, and the Oregon Assignors will not be made whole in the Chapter 11 Cases.

444. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Oregon Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Oregon Bond and has thereby breached its obligation under this contract.

445. As a direct and proximate result of GMIC's breach, the Oregon Assignors have suffered damages in an amount to be determined at trial, but no less than $25,000.

**MISSISSIPPI – BOND NO. GM209958**

**COUNT XXVII**
**Breach of Contract**
[on behalf of the Mississippi Assignors]

446. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

447. Voyager and GMIC are parties to the Mississippi Bond, which became effective on or around March 30, 2021 (the "Mississippi Bond").

448. The Mississippi Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $25,000. *See* Mississippi Bond No. GM209958.

449. Voyager obtained the Mississippi Bond, as required by Miss. Code Ann. § 75-16-63, in connection with its money transmission business in Mississippi.

450. In connection with obtaining the Mississippi Bond, Voyager paid a premium to GMIC in the amount of $625.

451. As part of the Mississippi Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

452. Under the clear and unambiguous terms of the Mississippi Bond, Voyager shall "comply with and abide by the provisions of the aforesaid Law and the Rules and Regulations of the Commissioner of the Department of Banking and Consumer Finance of the State of Mississippi, lawfully promulgated under said Law and **[] pay to the State, to said Commissioner, or to any other person under the provisions of this Act** or of any check, draft, money order, personal money order, or other instrument for the transmission or payment of money issued by the Principal within this State[.]" Mississippi Bond No. GM209958 (emphasis added).

453. Therefore, under the terms of the Mississippi Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Mississippi laws on money transmission, and other applicable rules.

454. Voyager has breached the clear terms of the Mississippi Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Mississippi Bond.

455. In connection with Mississippi Bond No. GM209958, GMIC is obliged to pay the Mississippi Assignors for damages suffered.

456. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Mississippi Assignors against GMIC. As of the date of this Complaint, there are 110 Mississippi customers that assigned their claims to Plaintiff. The outstanding amount of the Mississippi Assignors' claims exceeds the value of the Mississippi Bond, and the Mississippi Assignors will not be made whole in the Chapter 11 Cases.

457. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Mississippi Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Mississippi Bond and has thereby breached its obligation under this contract.

458. As a direct and proximate result of GMIC's breach, the Mississippi Assignors have suffered damages in an amount to be determined at trial, but no less than $25,000.

**ARKANSAS – BOND NO. GM211829**

**COUNT XXVIII**
**Breach of Contract**
[on behalf of the Arkansas Assignors]

459. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

460. Voyager and GMIC are parties to the Arkansas Bond, which became effective on or around October 12, 2021 (the "Arkansas Bond").

461. The Arkansas Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $10,000. *See* Arkansas Bond No. GM211829.

462. The Arkansas Bond provides that, Voyager "has applied to the Arkansas Securities Department for a Money Transmitter License as provided by law under the Act." On or around January 3, 2022, Voyager applied for, and obtained a money transmitter license.

463. In connection with obtaining the Arkansas Bond, Voyager paid a premium to GMIC in the amount of $250.

464. As part of the Arkansas Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

465. Under the clear and unambiguous terms of the Arkansas Bond, Voyager is obligated to "fully complies with the provisions of the Act, **and pays and discharges all amounts owed upon judgment or order obtained in any court of competent jurisdiction by any person or persons who may be injured or damaged by the Principal while conducting business as a Money Transmitter**, including judgments in suits for misappropriation of any funds paid into or deposited with [Voyager.]" Arkansas Bond No. GM211829 (emphasis added).

466. Therefore, under the terms of the Arkansas Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with Arkansas laws on money transmission, and other applicable rules.

467. Pursuant to Ark. Code Ann. § 23-55-610, "**[e]very licensee shall forward all money received for transmission according to the terms of the agreement** between the licensee and the sender unless the licensee has a reasonable belief or a reasonable basis to believe that the sender may be a victim of fraud or that a crime or violation of law, rule, or regulation has occurred, is occurring, or may occur." (emphasis added).

468. Further, pursuant to Ark. Code Ann. § 23-55-611, "**[e]very licensee shall refund all money received for transmission to the sender within 10 days** of receipt of the sender's written request for a refund of all money received for transmission." (emphasis added).

469. Voyager has breached the clear terms of the Arkansas Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Arkansas Bond.

470. In connection with Arkansas Bond No. GM211829, GMIC is obliged to pay the Arkansas Assignors for damages suffered.

471. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Arkansas Assignors against GMIC. As of the date of this Complaint, there are 153 Arkansas customers that assigned their claims to Plaintiff. The outstanding amount of the Arkansas Assignors' claims exceeds the value of the Arkansas Bond, and the Arkansas Assignors will not be made whole in the Chapter 11 Cases.

472. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Arkansas Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Arkansas Bond and has thereby breached its obligation under this contract.

473. As a direct and proximate result of GMIC's breach, the Arkansas Assignors have suffered damages in an amount to be determined at trial, but no less than $10,000.

## IDAHO – BOND NO. GM209951

## COUNT XXIX
**Breach of Contract**
[on behalf of the Idaho Assignors]

474. Plaintiff reincorporates and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

475. Voyager and GMIC are parties to the Idaho Bond, which became effective on or around March 30, 2021 (the "Idaho Bond").

476. The Idaho Bond is a valid, enforceable, and binding contract, pursuant to which GMIC specifically agreed to be bound in the principal amount of $10,000. *See* Idaho Bond No. GM209951.

477. Voyager obtained the Idaho Bond, as required by Idaho Code Ann. § 26-2908, in connection with its application for a money transmitter license. On or around February 15, 2022, Voyager applied for, and obtained a money transmitter license.

478. In connection with obtaining the Idaho Bond, Voyager paid a premium to GMIC in the amount of $250.

479. As part of the Idaho Bond, GMIC also agreed to be held jointly and severally liable with Voyager for payment of the bond amount.

480. Under the clear and unambiguous terms of the Idaho Bond, "In the event that the Principal fails to faithfully perform its obligations with respect to the receipt, handling, transmission, and ***payment of money*** in connection with either the sale and issuance of payment instruments or the transmission of money pursuant to Chapter 29, Title 26, Idaho Code, as the same may be amended from time to time, and any rules promulgated pursuant thereto, then the

bond shall be forfeited and paid to the State of Idaho or ***a claimant or authorized representative of a claimant.***" Idaho Bond No. GM209951 (emphasis added).

481. Therefore, under the terms of the Idaho Bond, Voyager is required to return customer funds, and engage in money transmission in compliance with the Idaho Money Transmitter Act, and other applicable rules.

482. Voyager has breached the clear terms of the Idaho Bond, among other things, by failing to return customer funds, triggering GMIC's liability under the Idaho Bond.

483. In connection with Idaho Bond No. GM209951, GMIC is obliged to pay the Idaho Assignors for damages suffered.

484. Pursuant to art. IV.R of the Plan, Plaintiff has been tasked with prosecuting claims on behalf of customers that suffered losses in connection with the events giving rise to Voyager's bankruptcy, including those of the Idaho Assignors against GMIC. As of the date of this Complaint, there are 180 Idaho customers that assigned their claims to Plaintiff. The outstanding amount of the Idaho Assignors' claims exceeds the value of the Idaho Bond, and the Idaho Assignors will not be made whole in the Chapter 11 Cases.

485. On or about November 30, 2023, Plaintiff first demanded payment from GMIC under the Idaho Bond. Plaintiff has renewed those demands in May 2024 and February 2025. GMIC has refused to make any payments to customers under the Idaho Bond and has thereby breached its obligation under this contract.

486. As a direct and proximate result of GMIC's breach, the Idaho Assignors have suffered damages in an amount to be determined at trial, but no less than $10,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on its behalf as follows:

A. Declaring that the term Contributed Third-Party Claims as that term is used in the Plan includes, without limitation, all of Assignors' claims and causes of action against the Surety Bonds;

B. Awarding damages in favor of Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

C. Awarding punitive and exemplary damages, in an amount to be determined at trial;

D. Awarding such injunctive or other equitable relief as the Court may deem just and proper, including restitution and disgorgement of profits;

E. Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F. Disallowing Claim No. 11193 under 11 U.S.C. § 502(e).

Dated: September 3, 2026
New York, New York

Respectfully submitted,

**TAFT STETTINIUS & HOLLISTER LLP**

*/s/ Jaimie L. Nawaday*
Jaimie L. Nawaday, #4294856
1155 Avenue of the Americas, Suite 2400
New York, NY 10036-2711
Telephone: (646) 914-1066
Facsimile: (646) 710-5247
jnawaday@taftlaw.com

*Counsel to Michael Wyse, as the Plan Administrator for the Voyager Wind-Down Debtor*